FILED
VANESSA L. ARMSTRONG, CLERK

NOV 13 2019

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

UNITED STATES OF AMERICA

v.

**RICHARD G. MAIKE**
**DOYCE G. BARNES**
**RICHARD J. ANZALONE**
**FARADAY HOSSEINIPOUR**
**DENNIS DVORIN**
**JASON L. SYN**

SECOND SUPERSEDING INDICTMENT

NO. <u>4:17CR-00012-JHM</u>
18 U.S.C. § 1341
18 U.S.C. § 1349
18 U.S.C. § 1957
26 U.S.C. § 7201
18 U.S.C. § 371

The Grand Jury charges:

## A. <u>INTRODUCTORY ALLEGATIONS</u>

1.      From on or about and between February 6, 2013, and continuing to on or about

December 31, 2014, **RICHARD G. MAIKE, DOYCE G. BARNES, RICHARD J.**

**ANZALONE, FARADAY HOSSEINIPOUR, DENNIS DVORIN**, and **JASON L. SYN**, the

defendants, engaged in a $25 million dollar fraudulent pyramid scheme, operating under the

name Infinity 2 Global or I2G (hereinafter "I2G"), by representing that investors would receive a

return on investment based upon an online internet gaming site called i2gcasino.com.

2.      **MAIKE, BARNES, ANZALONE, HOSSIENIPOUR, DVORIN, SYN**, and

others unnamed in this Indictment, falsely represented that I2G was generating massive profits

from its online internet gambling site and that the public could share in such profits through the

purchase of a $5,000 "Emperor" position in I2G.  In truth and in fact, I2G's purported profits

were bogus, and I2G was operating as a fraudulent pyramid scheme in which inflated returns were paid to early promoters in order to induce later victim-investors to invest in the company.

## B.  RELEVANT ENTITIES AND INDIVIDUALS

3.      On or about February 6, 2013, **MAIKE**, a resident of Owensboro, Kentucky, in Daviess County, Kentucky, incorporated Finance Ventures, LLC (hereinafter "Finance Ventures") in Wyoming.  **MAIKE** was the Owner and President of Finance Ventures.  **BARNES** was a co-owner of Finance Ventures.

4.      On or about July 15, 2013,  **MAIKE** registered I2G with the Wyoming Secretary of State's Office as the business trade name for Finance Ventures.  **MAIKE** operated I2G from his residence on Briarcliff Trace in Owensboro, Kentucky.  **MAIKE** registered the office of his accountant on Frederica Street in Owensboro, Kentucky, as the principal office for Finance Ventures.

5.      **BARNES** was a resident of North Carolina, a co-owner of Finance Ventures, and promoted I2G to victim investors.  **BARNES** received approximately $325,000 from the scheme.

6.      **ANZALONE** was a resident of California, and promoted I2G to victim investors.  **ANZALONE** received approximately $900,000 from the scheme.

7.      **HOSSEINIPOUR** was a resident of Florida, and promoted I2G to victim investors.  **HOSSEINIPOUR** received approximately $900,000 from the scheme.

8.      **DVORIN** was a resident of California, and promoted I2G to victim investors.  **DVORIN** received approximately $570,000 from the scheme.

9.      **SYN** was a resident of California, and promoted I2G to victim investors.  **SYN** received approximately $1,500,000 from the scheme.

10.    I2G was purportedly a multi-level direct marketing company which offered an "Infinite Opportunity" plan with multiple ways to earn commissions.  A person could join I2G as an "Independent Business Owner" (or IBO), by purchasing one of four Earning Ranks – Novice, Player, High Roller, or Emperor – for $119.95, $419.95, $619.95, or $5,019.95, respectively. The $19.95 portion of the new member fee was for digital access to I2G's "product" the I2G Touch, described below.  Selling the I2G Touch alone generated no commissions for an I2G member.  Instead, new members could earn commissions through "Fast Start Bonuses," "Leadership Pools," "Matching Bonuses," and through I2G's "Binary Income" compensation scheme through which an IBO generated commission payments by recruiting new members to buy into the company, who then became part of the recruiter's "downline."

11.    During its existence (from February 6, 2013, to July 22, 2014), I2G offered three "products":  the I2G Touch; i2gcasino.com; and Songstagram.  Each of these "products" had significant flaws that the co-conspirators did not disclose to investors in I2G at the time of their investments.

12.    The initial "product" offered by I2G was a computer application called the I2G Touch.  This computer application allowed a person to aggregate their various social media platforms such as Facebook, Twitter, and Instagram onto one computer screen.  It was also designed to offer users the ability to communicate with each other through video conferencing. The I2G Touch had many programming bugs that prohibited it from consistently working correctly.  The developer of the software filed for bankruptcy on September 5, 2013.  In addition, the application could be downloaded (under a different name) for free from the developer's web page.  On January 30, 2014, an I2G investor complained about this in an email that was

ultimately sent to **HOSSEINIPOUR**, **ANZALONE**, and **MAIKE**.  None of these facts were disclosed to potential I2G investors.

13.     The second "product" offered by I2G was i2gcasino.com, an online casino only available to users outside the United States.  The co-conspirators induced investors to purchase a membership rank in I2G in order to share in the supposed profits of the online casino.  The highest rank of Emperor provided the investor with the promise to share in 50% of the casino profits with the other Emperors, without sponsoring any new members.  Investors were told that only 5,000 Emperor Packages would be sold.  Though the casino did not generate a profit from its inception through December 31, 2014, the co-conspirators made misrepresentations about actual and potential profits of the casino to investors, causing over $20 million dollars of funds to be invested in I2G for Emperor Packages in hopes of revenue sharing returns on the investment. The co-conspirators promoted the Emperor Packages until July 22, 2014.  From July 22, 2014, until November 25, 2014, **MAIKE** continued to receive payments from individual promotors who continued to sell Emperor Packages.

14.     The third "product" offered by I2G was a computer application called Songstagram.  I2G briefly promoted this "product" from around March 2014 until June 2014. The application allowed a user to stream songs from the internet for a small fee and make a video to the music.  Some of the co-conspirators promised I2G investors that major entertainers were promoting the product and that members of I2G would share in the profits of each song downloaded.  In fact, none of the promised entertainers were promoting the "product," and I2G dropped the Songstagram "product" soon after it was introduced.

15.     Revenue from the I2G online casino and from the standalone sale (sales to buyers outside the IBO network) of I2G "products" was negligible.  Instead, essentially all of I2G's

revenue was generated from the sale of Emperor Packages and other I2G memberships.  The co-conspirators knew that I2G's income was generated not from the sale of I2G "products," but largely from the sale of Emperor Packages.  For example, on or about December 15, 2013, **HOSSEINIPOUR** appeared in a YouTube video of an online hangout[1] with **ANZALONE** and **SYN** titled "I2G Beast Mode Training with Special Guest Jason The Beast SYN."  During the video, **SYN** stated:  "I'm not a computer guy…$5,000 packages, that is the only package I sell.  You know what I'm talking about?  I'm not accepting less than $5,000 packages.  Why?  Because as a business you need to see the big picture.  My team, 99% of them bring at least three or seven packages.  Why?   Because this is not really a hanky panky job, this is big business."

16.    I2G took in as much as $25 million dollars in investor funds primarily based on false promises of profit sharing in an online casino.  Large commissions were paid to promoters who signed up multiple investors, but actual "product" sales were negligible.  On July 22, 2014, I2G abruptly changed its name to Global 1 Entertainment (hereinafter "G1E").  The I2G Touch was rebranded as the G1E Touch.  The rebranded company made no further mention of casino profits, Emperor Packages, or Songstagram.

## SCHEME AND ARTIFICE TO DEFRAUD

17.    Defendants knowingly participated in a scheme and artifice to defraud.  In furtherance of the scheme, and to induce investors to buy into I2G, the co-conspirators promoted I2G through conference calls, YouTube videos, in-person conferences, and small group meetings.  For example, **MAIKE** conducted monthly I2G conference calls in which I2G members and people interested in hearing about the company could call in and listen.  For

---

[1] A Google Hangout is an online communication platform which allows users to communicate via audio, video, and typed messages.  The Hangout session is commonly saved, and later posted to YouTube thereby increasing its audience.

example, in an August 10, 2013 conference call with potential I2G investors, **MAIKE** stated: "I live in Kentucky. We have no legal casinos here, so I can't gamble here in Kentucky but I can own stock in the Sands Corporation, or in Caesers Entertainment. I can own stock in those and I can get paid dividends based on the profit of the casinos, and that's exactly what we are doing. We are not making you a U.S. stockholder, but we are paying you dividends as long as you are . . . in the Emperor's pool where you can get paid that."

18.     In furtherance of the scheme, **MAIKE, BARNES, ANZALONE, DVORIN, HOSSEINIPOUR**, and **SYN** participated in both large in-person conferences and small group meetings where they would promote I2G to potential investors. At these large conferences, **MAIKE** and **BARNES** presented large cardboard checks that often overstated actual commissions received. For example, on or about January 1, 2014, **HOSSEINIPOUR** posted a YouTube video of an online hangout she conducted titled "Infinity 2 Global The Biggest Fastest Income Opportunity of 2014." During the video, **HOSSEINIPOUR** shows pictures of herself and other I2G promotors receiving large cardboard promotional commission checks which had been presented to her and others at an I2G event in Long Beach, California by **MAIKE**, among others. The checks represented commissions that **HOSSEINIPOUR** had allegedly received. However, in a subsequent email sent from **HOSSEINIPOUR** to **MAIKE**, **HOSSEINIPOUR** complains that she had been presented with checks from **MAIKE** at multiple events that included amounts that had not in fact been paid. She notes that she is still owed this money. These checks resulted in more individuals investing in I2G based on false representations.

19.     In furtherance of the scheme, **ANZALONE, DVORIN,** and **SYN** had regular meetings with potential investors at various locations in the Los Angeles, California vicinity. Several investors went to I2G meetings arranged by **ANZALONE, DVORIN,** and **SYN** at a

Denny's restaurant in Los Angeles, and purchased Emperor Packages based on the promises of profit sharing from the I2G casino.

20.     In furtherance of the scheme, **BARNES** recruited some of the initial I2G investors from his hometown of Goldsboro, North Carolina. **BARNES** met with investors at his home and at office space in Goldsboro, North Carolina. On October 28, 2013, in a conference call with potential I2G investors, **BARNES** said "All of the profits from the pool, 50% of them go into that Emperor Package. All of the Emperors who are in the company share in that equally each and every month. You will be able to receive that at the Emperor level. You do not need to sponsor anybody, it is a passive position."

21.     Victim-investors who purchased an Emperor Package sent their payments, primarily in the form of cashier's checks, to I2G "global headquarters," which was, in fact, **MAIKE**'s residence in Owensboro, Kentucky, by United States Postal Service and commercial interstate carriers. Between February 6, 2013, and December 31, 2014, **MAIKE** received and deposited at least $16 million from victim-investors for the purchase of Emperor positions in I2G. During the same period, over $4 million in monies received from victim-investors was diverted by **MAIKE** for personal use and for the purchase of real property in Kansas.

22.     In furtherance of the scheme and artifice to defraud, the scheme included material misrepresentations and concealment of material facts, including the following, among others:

- On or about August 10, 2013, **MAIKE** told potential I2G investors that "We want this to be a real business opportunity based on real profits. There's none of this artificial compounding you see in some of these programs…This is based on a real business and what the profits of that business are." In fact, small monthly payments that were fraudulently represented to be casino profits were made to investors during months in which the casino operated at a loss. There were no real casino profits;

- On or about October 28, 2013, **BARNES** told investors that "I personally in my own opinion, feel like we will be able to put between 100,000 and 200,000 people

in between now and the end of the year, and I think one half a million people next year is not out of the question at all." In fact, I2G had fewer than 7,000 members at the end of 2013, and fewer than 24,000 members at the end of 2014;

- On or about November 26, 2013, **MAIKE** told investors that "This is a real company and we pay real profits, not some magic number…The first month…roughly $8,000 went into the pool…the second month, we had, September…we had about $17,000 that went into that pool which was 50% of the profits. And last month…that number was up to $27,000." In fact, invoices sent to I2G from Plus Five Gaming, the company hosting the online casino, show that i2gcasino.com was operating at a net loss;

- On or about February 4, 2014, **MAIKE** told investors that "We are in the process of working on a project to purchase our own hotel casino facility. Now this will not be a small facility, it will be a large facility in the $500 million range. You heard me right, one half a billion dollars. It's going to be a big facility, and that will be a part of what is in the next phase." In fact, no such project existed;

- On or about April 1, 2014, while talking about Songstagram, **MAIKE** told investors, "We still have the artists lined up and ready to go. As soon as we have both apps, the iOS and Android app online…we will start to have the celebrities blast out to all of their Twitter followers…and when we do, it will be buckle your seat belts and hang on." In fact, no agreements with musical artists existed to promote Songstagram;

- On or about April 30, 2014, **HOSSEINIPOUR** posted a YouTube video of an online hangout she conducted titled "Faraday and Dave Digital Online Entertainment." During the video, **HOSSEINIPOUR** states, "Songstagram, this is a product that is going to be backed by major studios and major stars like Sony, Universal, Warner Brothers, Kobalt, EMI. Why are they going to do this? Because they want to sell music and get social media exposure. Brittany Spears, Justin Timberlake, Lady Gaga, Adam Levine, Prince, some of the performers that have signed on." In fact, none of these record companies or artists had any such agreement with I2G;

- On or about May 1, 2014, **DVORIN** appeared in a YouTube video entitled "Interview with Dennis Dvorin Top Leader with I2G May 2014," stating, "In my first month I made over $40,000. And then, in my second month I made that much money in a week, and I finished my first six months making over seven figures." In fact, bank records show **DVORIN** received $570,000 in total from I2G.

## COUNT 1
*(Conspiracy to Commit Mail Fraud)*

23.     The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 22 of the Second Superseding Indictment, and further alleges that:

24.     Beginning on or about February 6, 2013, and continuing through on or about December 31, 2014, in the Western District of Kentucky and elsewhere, the Defendants, **RICHARD G. MAIKE**, **DOYCE L. BARNES**, **RICHARD J. ANZALONE**, **FARADAY HOSSEINIPOUR**, **DENNIS DVORIN**, and **JASON L. SYN** did knowingly conspire to commit offenses against the United States, including violations of Title 18, United States Code, Section 1341 (mail fraud).

25.     In furtherance of the conspiracy and to achieve the object thereof, **MAIKE, BARNES, ANZALONE, HOSSEINIPOUR,  DVORIN**, and **SYN** committed and caused to be committed the following overt acts by causing to be delivered by mail and by commercial interstate carrier according to the direction thereon, cashier's checks for the purchase of I2G Emperor Packages on the dates and in the amounts set forth below:

|     | Victim-Investor | Date | Amount |
| --- | --- | --- | --- |
| (a) | K.H. | 06/21/2013 | $5,000.00 |
| (b) | K.H. | 06/24/2013 | $5,000.00 |
| (c) | J.A. | 06/17/2013 | $1,020.00 |
| (d) | J.A. | 07/22/2013 | $4,000.00 |
| (e) | Q.P. | 01/16/2014 | $35,136.50 |
| (f) | Q.P. | 01/23/2014 | $25,099.75 |
| (g) | B.F. | 02/12/2014 | $5,000.00 |

| (h) | S.V. | 02/07/2014 | $5,000.00 |
| (i) | B.W. | 05/31/2014 | $5,019.95 |
| (j) | B.W. | 06/27/2014 | $5,000.19 |
| (k) | M.K. | 12/06/2013 | $20,079.80 |
| (l) | M.K. | 12/26/2013 | $100,399.00 |
| (m) | S.J. | 12/13/2013 | $20,079.80 |
| (n) | S.J. | 12/26/2013 | $30,119.70 |
| (o) | S.J. | 12/27/2013 | $20,079.80 |
| (p) | S.J. | 12/30/2013 | $25,099.75 |

In violation of Title 18, United States Code, Sections 1341 and 1349.

The Grand Jury further charges:

### COUNTS 2-10
*(Money Laundering)*

26.     The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 22 of the Second Superseding Indictment, and further alleges that:

27.     On or about the dates listed below, in the Western District of Kentucky, Daviess County, Kentucky, and elsewhere, **RICHARD G. MAIKE**, the defendant, knowingly engaged or caused another to engage in the monetary transactions listed below in criminally derived property in an amount that was greater than $10,000, and which was derived from a specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341:

| Count | Date | Amount | Description |
|---|---|---|---|
| 2 | 11/20/2013 | $965,000 | Wire transfer from PNC (Acct. 9374) to HSBC (Acct. 3838) |

| 3 | 11/25/2013 | $965,000 | Wire transfer from HSBC (Acct. 3838) to Chase (Acct. 6309) |
| 4 | 11/26/2013 | $964,000 | Wire transfer from Chase (Acct. 6309) to Charles Wilson Title |
| 5 | 04/10/2014 | $1,360,000 | Wire transfer from HSBC (Acct. 3838) to ESB RAW Ventures (Acct. 1304) |
| 6 | 04/11/2014 | $1,372,971 | Wire transfer from ESB RAW Ventures (Acct. 1304) to Charles Wilson Title |
| 7 | 04/29/2014 | $ 500,000 | Wire transfer from HSBC (Acct. 3838) to ESB RAW Ventures (Acct. 1304) |
| 8 | 04/30/2014 | $ 420,000 | Currency deposit to ESB RAW Ventures |
| 9 | 04/20/2014 | $ 920,000 | Wire transfer from ESB RAW Ventures (Acct. 1304) to Charles Wilson Title |
| 10 | 04/20/2014 | $ 85,000 | Wire transfer from Finance Ventures (Fifth Third Acct. 1755) to Charles Wilson Title |

All in violation of Title 18, United States Code, Section 1957.

The Grand Jury further charges:

## Counts 11-12
### (Tax Evasion)

### INTRODUCTION

30.   Beginning on or about February 6, 2013, **RICHARD G. MAIKE,** the defendant, was the Chief Executive Officer of Infinity 2 Global, or I2G ("I2G"), a company that maintained its principal place of business in the Western District of Kentucky and that purported to be in the business of multilevel marketing.  I2G had a business account at a bank in Owensboro in the name of Finance Ventures, LLC, d/b/a Infinity 2 Global, into which the Defendant caused to be deposited cashier's checks received from investors in I2G.

31.     RAW Ventures, LLC ("RAW Ventures"), was a nominee entity that **MAIKE**
registered in the state of Kansas on or about November 14, 2013.  **MAIKE** and his wife were the
only members of RAW Ventures.   On November 14, 2013, RAW Ventures entered into two
contracts for the purchase of three undeveloped tracts of land zoned for agricultural use located
in or near Manhattan, Kansas.  The first contract related to the purchase of a tract of land for
$962,000, to close in November 2013.  The second contract, for the purchase of two other tracts
adjacent to the first one, was for a purchase price of $2,368,000, to close in April 2014.

32.     On or about and between November 20, 2013, and November 27, 2013, **MAIKE**,
aided and abetted by others, caused $965,000 to be transferred from the I2G business account in
Kentucky, through a bank account located in Hong Kong in the name of I2G Global HK Limited,
through a Kentucky bank account in the name of **MAIKE's** wife, and then to a title company in
Kansas to close on the purchase of the first parcel of land located in Kansas.  The purchaser of
the property was RAW Ventures.  **MAIKE** and his wife both signed the land contract as owners
of RAW Ventures, and the recorded deed shows the owner of the real property to be RAW
Ventures.

33.     On December 30, 2013, **MAIKE** opened a bank account at ESB Financial in
Manhattan, Kansas, in the name of RAW Ventures.  At the same time, **MAIKE** rented a safe
deposit box also at ESB Financial.

34.     For the second real estate contract, **MAIKE** generated the closing proceeds as he
had the first, again using funds he had received from people investing in his company, I2G.  On
or about and between February 27, 2014, and March 4, 2014, **MAIKE** caused three separate
transfers to be made from I2G's business account in Owensboro, Kentucky, to the I2G Hong
Kong bank account in the total amount of approximately $1,400,000.  On April 10, 2014,

**MAIKE** caused $1,360,000 to be transferred from I2G's Hong Kong bank account to RAW Venture's bank account in Kansas.  On April 29, 2014, **MAIKE** caused another $500,000 to be wired from the I2G Hong Kong account to the RAW Ventures bank account in Kansas.  On or about April 30, 2014, **MAIKE** accessed the safe deposit box at ESB Financial in Kansas and removed $420,000 in U.S. currency from the box which was deposited into the RAW Ventures bank account that same day.  After the I2G investor funds were deposited into the RAW Ventures bank account, **MAIKE** caused two wire transfers in the total amount of approximately $2.3 million to be made to the title company to close on the second real estate contract.  In addition, on or about April 30, 2014, **MAIKE**, caused $85,000 in I2G investor funds to be wire transferred from I2G's business account in Kentucky directly to the title company in Kansas.

35.    In May 7, 2015, **MAIKE** produced fraudulent loan documents for $965,000 and $2,365,000 to conceal his receipt and use of I2G funds for the purchase of Kansas real estate. These funds do not reflect arms-length transactions because, among other things, they establish unsecured loans from a business to its principal owner, featuring (1) 3% and 4% interest rates, (2) interest only payments for ten years, and (3) no initial payment required for 18 months.

### COUNT 11

36.    From approximately November 2013 and continuing thereafter up to on or about May 7, 2015, in the Western District of Kentucky, and elsewhere, **RICHARD G. MAIKE**, the defendant, then a resident of Owensboro, Kentucky, did willfully attempt to evade and defeat a substantial income tax due and owing by him to the United States of America for the calendar year 2013, by committing and causing to be committed the following affirmative acts of evasion, among others:

(a) failing to observe corporate formalities and freely transferring monies from one corporate entity to another without making the usual and customary business records to document transfers;

(b) using corporate funds for personal expenses;

(c) using a series of wire transfers through different corporate entities both inside and outside the United States to effect the purchase of real estate in Kansas, in an attempt to conceal the source of the funds;

(d) using a shell corporation as a nominee to hold title to a substantial asset purchased for the Defendant's personal use from corporate assets;

(e) creating false and fraudulent loan documents to conceal the use of I2G corporate funds for a substantial personal expenditure; and

(f) on or about November 24, 2014, submitting to the IRS a false IRS Form 1040 U.S. Individual Income Tax Return for calendar year 2013 on behalf of himself which was false and fraudulent in that it did not disclose $965,000 in misappropriated funds from Finance Ventures, Inc. dba Infinity 2 Global and used to purchase real estate in Kansas in November of 2013.

In violation of Title 26, United States Code, Section 7201.

The Grand Jury further charges:

## COUNT 12

37.     The Grand Jury repeats and realleges each of the Introductory Allegations contained in paragraphs 30 through 35 above.

38.     From approximately November 2013 and continuing thereafter up to on or about October 30, 2017, in the Western District of Kentucky, and elsewhere, **RICHARD G. MAIKE**,

the defendant, then a resident of Owensboro, Kentucky, did willfully attempt to evade and defeat

a substantial income tax due and owing by him to the United States of America for the calendar

year 2014, by committing and causing to be committed the following affirmative acts of evasion,

among others:

(a) failing to observe corporate formalities and freely transferring monies from one

corporate entity to another without making the usual and customary business records to

document transfers;

(b) using corporate funds for personal expenses;

(c) using a series of wire transfers through different corporate entities both inside and

outside the United States to effect the purchase of real estate in Kansas, in an attempt to conceal

the source of the funds;

(d) using a shell corporation as a nominee to hold title to a substantial asset purchased for

the Defendant's personal use from corporate assets;

(e) creating false and fraudulent loan documents to conceal the use of I2G corporate

funds for a substantial personal expenditure; and

(f) on or about October 30, 2017, submitting to the IRS a false IRS Form 1040 U.S.

Individual Income Tax Return for calendar year 2014 on behalf of himself in that it did not

disclose a total of $2,365,000 of misappropriated funds from Finance Ventures, Inc dba Infinity

2 Global.  This $2,365,000 includes $420,000 in currency that Maike removed from a safety

deposit box with ESB Financial and deposited into the RAW Ventures LLC bank account.  All

of the $2,365,000 was used to purchase real estate in Kansas.

In violation of Title 26, United States Code, Section 7201.

The Grand Jury further charges:

## COUNT 13
*(Securities Fraud)*

39.     The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 22 of the Second Superseding Indictment, and further alleges that:

40.     On or about the following dates, in the Western District of Kentucky, and elsewhere, **RICHARD G. MAIKE**, **DOYCE G. BARNES**, **RICHARD J. ANZALONE**, **FARADAY HOSSEINIPOUR**, **DENNIS DVORIN**, and **JASON L. SYN**, the defendants, knowingly and willfully combined, conspired, and agreed with one another, and others known and unknown, directly and indirectly, in connection with the sale of securities by use of the means and instrumentalities of interstate commerce and the mails, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240, 10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons as charged in Count 1 of this Second Superseding Indictment during the sale of the following securities:

| Victim-Investor | | Date | Amount |
|---|---|---|---|
| (a) | K.H. | 06/21/2013 | $5,000.00 |
| (b) | K.H. | 06/24/2013 | $5,000.00 |
| (c) | J.A. | 06/17/2013 | $1,020.00 |

| (d) | J.A. | 07/22/2013 | $4,000.00 |
| (e) | Q.P. | 01/16/2014 | $35,136.50 |
| (f) | Q.P. | 01/23/2014 | $25,099.75 |
| (g) | B.F. | 02/12/2014 | $5,000.00 |
| (h) | S.V. | 02/07/2014 | $5,000.00 |
| (i) | B.W. | 05/31/2014 | $5,019.95 |
| (j) | B.W. | 06/27/2014 | $5,000.19 |
| (k) | M.K. | 12/06/2013 | $20,079.80 |
| (l) | M.K. | 12/26/2013 | $100,399.00 |
| (m) | S.J. | 12/13/2013 | $20,079.80 |
| (n) | S.J. | 12/26/2013 | $30,119.70 |
| (o) | S.J. | 12/27/2013 | $20,079.80 |
| (p) | S.J. | 12/30/2013 | $25,099.75 |
| (q) | M.L.1 | 08/21/2014 | $50,000.00 |
| (r) | N.M. | 10/02/2014 | $30,000.00 |
| (s) | M.L.2 | 10/30/2014 | $15,059.85 |
| (t) | S.H. | 11/25/2014 | $15,059.85 |

In violation of Title 15, United States Code, Section 78j(b), and Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

As a result of committing offenses in violation of Title 18, United States Code, Sections 1341 and 1349, and Title 18, United States Code, Section 1957 as alleged in this Second

Superseding Indictment, defendants **RICHARD G. MAIKE**, **DOYCE G. BARNES**, **RICHARD J. ANZALONE**, **FARADAY HOSSEINIPOUR**, **DENNIS DVORIN**, and **JASON L. SYN**, defendants herein, shall forfeit to the United States, any and all property constituting or derived from proceeds the defendant obtained, directly and indirectly, as a result of these offenses, and any and all property involved in the commission of these offenses (or traceable thereto), including but not limited to: One Hundred Fifty Three Thousand Eight Hundred Fifty Dollars ($153,850.00) in United States Currency, 2005 Rolls Royce, Four Door, Silver in Color, in the name of Dennis Dvorin, VIN#: SCA1S68455UX07739, and Real Property located at or near 00000 Tabor Lane, Manhattan, Riley County, Kansas, including all buildings and improvements thereon and appurtenances thereto, more particularly described below.

### REAL PROPERTY

LAND IN RILEY COUNTY, KANSAS, BEING THE SOUTH HALF (S ½); SOUTH HALF OF THE NORTH HALF (S ½ N ½ ); NORTHEAST QUARTER (NE ¼ NE ¼ ) OF SECTION SIXTEEN (16), TOWNSHIP ELEVEN (11) SOUTH, RANGE (9) EAST OF THE 6TH PRINCIPALMERIDAN IN RILEY COUNTY, KANSAS. REFERENCE IS HEREBY MADE FOR A COMPLETE AND ACCURATE DESCRIPTION, REGISTER'S OFFICE FOR RILEY COUNTY, KANSAS. TAX ID NO. 081-285-16-0-00-00-001.00-0

BEING THE SAME PROPERTY CONVEYED TO RICHARD L. EDWARDS, LLC BY GENERAL WARRANTY DEED FROM FEDERAL LAND BANK WICHITA, C/O RICHARD AND JANICE EDWARDS, DATED 03/2008 AND RECORDED ON 03/2008 IN BOOK NO. 814, PAGE 2770, SAID REGISTER'S OFFICE FOR SAID COUNTY

ALSO BEING THE SAME PROPERTY CONVEYED TO FAE MOO MESA, LLC BY GENERAL WARRANTY DEED FROM FEDERAL LAND BANK WICHITA, C/O RICHARD AND JANICE EDWARDS, DATED 03/2008 AND RECORDED ON 03/2008 IN BOOK NO. 832, PAGE 7034 SAID REGISTER'S OFFICE FOR SAID COUNTY

Being the same property conveyed to RAW Ventures, LLC from Moo Mesa, LLC by General Warranty Deed dated 11/18/13 and recorded on 11/27/13, Book 857, Page 4623, in the Register's Office of RILEY County, Kansas.

LAND IN RILEY COUNTY, KANSAS, BEING ALL OF SECTION TWENTY (20), TOWNSHIP ELEVEN (11) SOUTH, RANGE NINE (9) BEST OF THE 6TH P.M., RILEY COUNTY KANSAS. TAX ID NO. 081-284-20-0-00-00-001.00-0; and

ALL OF SECTION TWENTY-ONE (21), TOWNSHIP ELEVEN (11) SOUTH, RANGE NINE (9) EAST OF THE 6TH P.M. RILEY COUNTY, KANSAS REFERENCE IS HEREBY MADE FOR A COMPLETE AND ACCURATE DESCRIPTION, REGISTER'S OFFICE FOR RILEY COUNTY, KANSAS. TAX ID NO. 081-285-21-0-00-00-001.00-0

BEING THE SAME PROPERTY CONVEYED TO FAE MOO MESA, LLCS, BY GENERAL WARRANTY DEED FROM FRANK W. HAWK, TRUST AND DOROTHY M. HAWKS, TRUST, DATED 01/2007 AND RECORDED ON 01/2007 IN BOOK NO. 770, PAGE 280, SAID REGISTER'S OFFICE FOR SAID COUNTY

ALSO BEING THE SAME PROPERTY CONVEYED TO MOO MESA, LLC BY GENERAL WARRANTY DEED FROM FAE MOO MESA, LLC, DATED 07/2007 AND RECORDED ON 07/2007 IN BOOK NO. 770, PAGE 280 SAID REGISTER'S OFFICE FOR SAID COUNTY

Being the same property conveyed to RAW Ventures, LLC from Moo Mesa, LLC by General Warranty Deed dated 03/13/14 and recorded on 05/01/14, Book 858, Page 7272, in the Register's Office of RILEY County, Kansas.

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), Title 21,

United States Code, Section 853, and Title 28, United States Code, Section 2461.

A TRUE BILL.

**REDACTED**

MICHAEL A. BENNETT
ATTORNEY FOR THE UNITED STATES,
Acting Under Authority Conferred by 28 U.S.C. § 515.

UNITED STATES OF AMERICA v **RICHARD G. MAIKE, et. al.**

## P E N A L T I E S

Count 1:  NM 20 yrs./$250,000 fine/both/NM 5 yrs. Supervised Release
Counts 2-10:  NM 10 yrs./$250,000 fine/both/NM 3 yrs. Supervised Release (each count)
Counts 11-12:   NM 5 yrs./$100,000 fine/both/NM 3 yrs. Supervised Release (each count)
Count 13:  NM 5 yrs./$250,000 fine/both/NM 3 yrs. Supervised Release
Forfeiture

## N O T I C E

**ANY PERSON CONVICTED OF AN OFFENSE AGAINST THE UNITED STATES SHALL BE SUBJECT TO SPECIAL
ASSESSMENTS, FINES, RESTITUTION & COSTS.**

SPECIAL ASSESSMENTS

18 U.S.C. § 3013 requires that a special assessment shall be imposed for each count of a conviction of offenses committed after
November 11, 1984, as follows:

|  | Misdemeanor: | $ 25 per count/individual | Felony: | $100 per count/individual |
|---|---|---|---|---|
|  |  | $125 per count/other |  | $400 per count/other |

FINES

In addition to any of the above assessments, you may also be sentenced to pay a fine. Such fine is due _immediately_ unless the court
issues an order requiring payment by a date certain or sets out an installment schedule.  You shall provide the United States Attorney's
Office with a current mailing address for the entire period that any part of the fine remains unpaid, or you may be held in contempt of
court.  18 U.S.C. § 3571, 3572, 3611, 3612

**Failure to pay fine as ordered may subject you to the following**:

1.  **INTEREST** and **PENALTIES** as applicable by law according to last date of offense.

     For offenses occurring after December 12, 1987:

     No **INTEREST** will accrue on fines under $2,500.00.

     **INTEREST** will accrue according to the Federal Civil Post-Judgment Interest Rate in effect at
     the time of sentencing.  This rate changes monthly.  Interest accrues from the first business day
     following the two week period after the date a fine is imposed.

     **PENALTIES** of:

     10% of fine balance if payment more than 30 days late.

     15% of fine balance if payment more than 90 days late.

2.  Recordation of a **LIEN** shall have the same force and effect as a tax lien.

3.  Continuous **GARNISHMENT** may apply until your fine is paid.

18 U.S.C. §§ 3612, 3613

     If you **WILLFULLY** refuse to pay your fine, you shall be subject to an **ADDITIONAL FINE**
     of not more than the greater of $10,000 or twice the unpaid balance of the fine; or
     **IMPRISONMENT** for not more than 1 year or both.  18 U.S.C. § 3615

RESTITUTION

If you are convicted of an offense under Title 18, U.S.C., or under certain air piracy offenses, you may also be ordered to make restitution to any victim of the offense, in addition to, or in lieu of any other penalty authorized by law.  18 U.S.C. § 3663

APPEAL

If you appeal your conviction and the sentence to pay your fine is stayed pending appeal, the court shall require:

      1.        That you deposit the entire fine amount (or the amount due under an installment schedule during the time of your appeal) in an escrow account with the U.S. District Court Clerk, or

      2.        Give bond for payment thereof.

      18 U.S.C. § 3572(g)

PAYMENTS

If you are ordered to make payments to the U.S. District Court Clerk's Office, certified checks or money orders should be made payable to the Clerk, U.S. District Court and delivered to the appropriate division office listed below:

LOUISVILLE:          Clerk, U.S. District Court
                            106 Gene Snyder U.S. Courthouse
                            601 West Broadway
                            Louisville, KY  40202
                            502/625-3500

BOWLING GREEN:   Clerk, U.S. District Court
                            120 Federal Building
                            241 East Main Street
                            Bowling Green, KY  42101
                            270/393-2500

OWENSBORO:      Clerk, U.S. District Court
                            126 Federal Building
                            423 Frederica
                            Owensboro, KY  42301
                            270/689-4400

PADUCAH:         Clerk, U.S. District Court
                            127 Federal Building
                            501 Broadway
                            Paducah, KY  42001
                            270/415-6400

If the court finds that you have the present ability to pay, an order may direct imprisonment until payment is made.

FORM DBD-34
JUN.85

No. 4:17CR-00012-JHM

# UNITED STATES DISTRICT COURT
Western District of Kentucky
At Owensboro

FILED
VANESSA L. ARMSTRONG, CLERK

NOV 1 3 2019

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

THE UNITED STATES OF AMERICA

v.

**RICHARD G. MAIKE**
**DOYCE G. BARNES**
**RICHARD J. ANZALONE**
**FARADAY HOSSEINIPOUR**
**DENNIS DVORIN**
**JASON L. SYN**

## INDICTMENT

**Count 1**
*Conspiracy to Commit Mail Fraud*
18 U.S.C. §§ 1341 and 1349

**Count 2-4**
*Money Laundering*
18 U.S.C. § 1957

**Count 5-10**
*Money Laundering*
18 U.S.C. § 1957

**Count 11-12**
*Tax Evasion*
26 U.S.C. § 7201

**Count 13**
*Securities Fraud*
15 U.S.C. § 78j(b) and
18 U.S.C. § 371

Forfeiture

*A true bill.*

# REDACTED

*Filed in open court this13[th] day of November, 2019.*

_____
*Clerk*

*Bail, $*