1           UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF KENTUCKY
2                OWENSBORO DIVISION

3    UNITED STATES OF AMERICA,    )    Case No. 4:17-CR-00012-GNS
                                  )
4            Plaintiff,           )
                                  )
5    v.                           )
                                  )
6    RICHARD G. MAIKE,            )
     DOYCE G. BARNES, and         )
7    FARADAY N. HOSSEINIPOUR,     )
                                  )    August 25, 2022
8            Defendants.          )    Owensboro, Kentucky

9                     * * * * *
                      **VOLUME 17**
10            TRANSCRIPT AT JURY TRIAL
        BEFORE HONORABLE GREG N. STIVERS
11      UNITED STATES DISTRICT CHIEF JUDGE
                      * * * * *
12

13   APPEARANCES:
     For United States:      Marisa J. Ford
14                           U.S. Attorney's Office
                             717 West Broadway
15                           Louisville, KY 40202

16                           Madison J. Sewell
                             U.S. Attorney's Office
17                           241 East Main Street, Suite 305
                             Bowling Green, KY 42101
18

19   [Defendants present.]

20

21               April R. Dowell, CRR, RMR, CRR
                    Official Court Reporter
22                  232 U.S. Courthouse
                    Louisville, KY 40202
23                  (502) 625-3778

24   Proceedings recorded by certified stenographer, transcript
     produced by computer.
25

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant Richard G. Maike:
                            Reed J. Hollander
 3                          Nelson Mullins Riley & Scarborough LLP
                            4140 Parklake Avenue, Suite 200
 4                          Raleigh, NC 27612

 5                          Solomon L. Wisenberg
                            Nelson Mullins Riley & Scarborough LLP
 6                          101 Constitution Avenue SW, Suite 900
                            Washington, DC 20001
 7
      For Defendant Doyce B. Barnes:
 8                          R. Kenyon Meyer
                            Dinsmore & Shohl LLP
 9                          101 S. Fifth Street, Suite 2500
                            Louisville, KY 40202
10
      For Defendant Faraday N. Hossienipour:
11                          Wayne D. Manning
                            Law Office of Wayne D. Manning
12                          600 Paris Road
                            Bogata, TX 75417
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Begin proceedings in open court 9:24 a.m.)

2          THE COURT:  Did the defendants get the 302s?  Did

3     you-all have enough time to digest them collectively?

4          MR. MEYER:  Yes, Your Honor.

5          MR. MANNING:  Yes, Your Honor.

6          THE COURT:  Good.  Well, I was thinking about this.

7     I hope that my impressions were not completely off base in

8     terms -- maybe there were tons of gold nuggets in there, I

9     just didn't really appreciate them, but in any event, I'm

10    glad -- at the end, I think in this case at least, I'm glad

11    you-all got a chance to look at those so there will be no

12    stone left unturned.  Mr. Sewell, anything you want to talk

13    about?

14         MR. SEWELL:  Nothing from Mr. Sewell.

15         MR. HOLLANDER:  There is one request I would like to

16    make, Your Honor, based upon the 302s that we looked at; the

17    Jencks statements.  That is the -- there is a 302 of Chuck

18    King -- one of the Chuck King 302s where he sends a list -- if

19    I remember it correctly, he sends a list of people who are

20    part of his network to Special Agent McClelland and they are

21    included in the 1(A), but I don't know how many there are, so

22    they're not -- the 1(A) is not attached.

23         And I understand that that's not Jencks material,

24    but if there are -- depending on how many of those there are,

25    it could be Giglio or Brady material, so I would -- that's the

1   only request I would make.  And we're not going to ask for a

2   continuance other than a few minutes if we get that, so I

3   would like to request those if they're available; the 1(A)

4   folder with that list.

5            THE COURT:  All right.  Mr. Sewell, any objection to

6   that?

7            MS. FORD:  Judge, I don't have any problem.  I can't

8   tell you exactly the number of pages, but it's not terribly

9   voluminous.  I just would need --

10            THE COURT:  I noted that in Mr. -- in Mr. King's

11   statement.

12            MS. FORD:  I need a few minutes to retrieve it and

13   make copies for everybody.

14            THE COURT:  Yeah, if you wouldn't mind doing that.

15   It seems like some of the 1(A)s were in there with what I

16   looked at and then I noted that one was not, so --

17            MS. FORD:  Sometimes when they're really voluminous,

18   I -- I just didn't print them.

19            THE COURT:  Okay.

20            MS. FORD:  I was doing all the printing by myself,

21   so --

22            THE COURT:  Here's one condition that I thought

23   about is that if -- if former Agent McClelland is going to be

24   questioned about any of those 302s, that he be handed a copy

25   of it before any questions and -- 'cause he -- I don't expect

1   him to have memorized all of that.  So it just seems like for

2   efficiency and fairness, if they're being questioned about --

3   for instance, Chuck King.  "You met with Chuck King and he

4   said this," I just think he should have that in front of him.

5           That just seems appropriate to me, so that's what

6   I'm going to ask the defense attorneys to do if there are

7   questions about a particular statement from one of those 302s,

8   all right?  Yes, ma'am; Ms. Ford?

9           MS. FORD:  The only other thing I wanted to say,

10  Judge, was we did -- it came up at the very end of yesterday.

11  And since I'm making copies of that 1(A), I know Mr. Meyer has

12  looked at it, but the -- one of the last documents I was

13  asking Special Agent McClelland, that wire transfer that's in

14  the security fraud count and Mr. Meyer had objected, and we

15  did locate -- the records were produced in discovery and they

16  are certified as business records.

17          THE COURT:  The money that Scott Majors wired --

18          MS. FORD:  Yes, sir.  Yes.

19          THE COURT:  Okay.

20          MS. FORD:  So we showed that the other day --

21  yesterday -- but we just made copies as well, so --

22          THE COURT:  Are you going to introduce that as an

23  exhibit then?

24          MS. FORD:  Yes, sir.

25          THE COURT:  Okay.  All right.  Mr. Meyer, anything

1      you want to talk about?

2              MR. MEYER:  No, sir.  Thank you.

3              THE COURT:  Mr. Manning, how are you this morning?

4              MR. MANNING:  I'm okay.  I have to get a few extra

5      ones today that I didn't get to last night, so I'm trying to

6      briefly go through them.

7              THE COURT:  All right.  Do you need a few minutes?

8              MR. MANNING:  I don't want to delay.  Let's go --

9      I'll go as we go.  That's fine.

10             THE COURT:  I'll give you three minutes and 27

11     seconds.

12             MR. MANNING:  Works for me.

13             THE COURT:  We got just a little bit.  You can flip

14     through it -- at least a couple of them in the next couple of

15     minutes.

16             MS. FORD:  Just to explain that too particularly

17     because Mr. Manning waited here in the courthouse to get his

18     copies last night.  And if the court recalls when this first

19     came up -- because they were specifically asking about

20     Scott -- Mr. Manning was asking about Scott Majors and Chuck

21     King.  Those had been pulled and those are the ones the court

22     initially reviewed.  So when we were copying, I had those

23     segregated and after we had delivered to Mr. Manning, we

24     realized --

25             THE COURT:  He didn't get the ones he had asked for?

1          MS. FORD:  He had asked for.  And so we added those

2     copies for Mr. Wisenberg and Mr. Meyer because they were back

3     at the hotel and they were delivered there, but that's --

4     unfortunately he had left and --

5          THE COURT:  Okay.  Very well.

6          MR. MANNING:  And I know they did not do it on

7     purpose.

8          THE COURT:  I understand.  Well, honestly, we --

9     take a couple minutes.  Those are the ones you asked for,

10    right?

11         MS. FORD:  Yes, sir.  Judge, is there anything else

12    right now or can I be excused to go locate that 1(A)?

13         THE COURT:  You may be excused; yes, ma'am.  We'll

14    take a break.  And if you can get back in a couple minutes,

15    maybe everything will flow smoothly with Mr. Manning's time to

16    review those 302s.

17         (Discussion off the record.)

18         THE COURT:  Go ahead and bring the jury up, please.

19    I'd love to get this jury in and get started, so are you-all

20    ready?

21         MR. MEYER:  Yes.

22         THE COURT:  Let's bring the jury in, please.

23         COURT SECURITY OFFICER:  All rise for the jury,

24    please.

25         (Jury in.)

1    THE COURT:  All right.  Welcome, folks.  Sorry for

2    the delay.  We had business that had to be attended to.  So

3    hope you enjoyed an extra hour of sleep or leisure this

4    morning.  I know I sure did, so let's -- all right.  Here he

5    is.  Mr. McClelland, you're still under oath, okay?

6             THE WITNESS:  Thank you.

7                  CONTINUED DIRECT EXAMINATION

8    BY MS. FORD:

9    Q.  Good morning.

10   A.  Good morning.

11   Q.  All right.  Special Agent McClelland, I don't think we'll

12   be much longer this morning, at least on my part.  I wanted to

13   pick up by asking you a few questions.  We were looking

14   yesterday at -- at this list that --

15             MR. MEYER:  I don't think that's been admitted.

16   It's being shown to the jury.  Yesterday it was not.

17             MS. FORD:  I don't want to admit it.

18             THE COURT:  It won't be admitted.  Yeah.  Just to be

19   shown to the witness and the attorneys.

20   BY MS. FORD:

21   Q.  Okay.  So do you remember yesterday we were talking about

22   you had prepared a list of people who had purchased Emperor

23   positions and where you had found certified checks that had

24   been -- cashier's checks, I apologize -- that had been

25   deposited into Infinity 2 Global account here in Owensboro.

1    Do you remember that?

2    A.  Yes.

3    Q.  Okay.  And we were talking late in the day yesterday about

4    this particular list where we had -- you had identified by

5    initials somebody with the initials MK and somebody with the

6    initials SJ, do you remember that?

7    A.  Yes.

8    Q.  And those were two individuals -- two persons who bought

9    Emperor positions in Infinity 2 Global?

10   A.  Yes.

11   Q.  Okay.  And what did the initials MK stand for?

12   A.  Michelle Kim.

13   Q.  Okay.  And you had interviewed Ms. Kim?

14   A.  Yes.

15   Q.  Okay.  And what about SJ?

16   A.  Shin Jeong.

17   Q.  And you also had talked to Shin Jeong?

18   A.  Yes.

19           MS. FORD:  All right.  Judge, if I could approach

20   the witness?

21           THE COURT:  Yes, ma'am.

22   Q.  Agent McClelland, I'm going to hand you what's been marked

23   Government Exhibits 57, 58, 59, 60, 61, and 62.

24           MR. WISENBERG:  And, Your Honor, may we have the

25   same continuing objections we've had in general to this

1    testimony?

2              THE COURT:  Yes, sir.

3              MR. WISENBERG:   Thank you.

4    BY MS. FORD:

5    Q.  Do you recognize those?

6    A.  Yes.

7    Q.  Okay.  What do you recognize them to be?

8    A.  These are cashier's check from Michelle Kim and Shin

9    Jeong --

10   Q.  Okay.  And were they --

11   A.  -- payable to Infinity 2 Global.

12   Q.  Okay.  And these were for the purchase of Emperor

13   positions in the company?

14   A.  Presumably, yes.

15   Q.  Okay.

16   A.  Yes.

17             MS. FORD:  Judge, I would move for the admission of

18   Government's 57, 58, 59, 60, 61, and 62.

19             MR. WISENBERG:  No objection.

20             THE COURT:  Without objection it will be admitted.

21             (Government Exhibits 57 through 62 admitted in

22   evidence.)

23   Q.  And, Special Agent, you said you had talked to these two

24   individuals and I asked you yesterday where they lived.  At

25   the time that you spoke with them, did you prepare a summary

1   report of your conversation with them?

2   A.  Yes.

3   Q.  Okay.  And as part of that, do you typically take down

4   contact information?

5   A.  Yes.

6   Q.  You spoke to both of these individuals by telephone,

7   didn't you?

8   A.  Yes.

9   Q.  Okay.  I don't think yesterday when I asked you -- do you

10  remember where Michelle Kim was living in December 2013?

11  A.  No.

12  Q.  Okay.  Would you have recorded that in your report?

13  A.  Yes.

14  Q.  And what about Shin Jeong, do you remember where she was

15  living when you spoke to her in 2015?

16  A.  I'm pretty sure it was California, but I may be incorrect.

17  I'm not a hundred percent sure.

18  Q.  But would you have put that in your report at the time

19  that you spoke with her?

20  A.  Yes.

21  Q.  Okay.  So would those reports refresh your recollection of

22  where those individuals lived?

23  A.  Yes.

24          MS. FORD:  Okay.  Judge, may I approach?

25          THE COURT:  Yes, ma'am.

1    Q.  Just take a look at these.

2    A.  Okay.

3    Q.  And having -- are these copies of the reports you prepared

4    in 2015 when you interviewed Ms. Kim and Shin Jeong?

5    A.  Yes.

6    Q.  All right.  And at the time that they purchased their

7    Emperor positions, where was Michelle Kim living?

8    A.  Las Vegas.

9    Q.  Okay.  And at the time that you spoke to Shin Jeong in

10   2015 where was she living?

11   A.  Outside of Chicago.

12   Q.  Okay.  And is that where she was living when she purchased

13   her Emperor positions?

14   A.  Yes.

15   Q.  So she was living in Illinois?

16   A.  Yes.

17   Q.  You indicated in your list that Shin Jong purchased

18   Emperor positions and sent cashier checks on December 13th,

19   December 26th, December 27th, and December 30th of 2013; is

20   that correct?

21   A.  Yes.

22   Q.  Okay.  And the total of the checks -- the first set of

23   cashier checks was $20,000 then $30,000 dollars.  These are --

24   I'm rounding -- then $20,000 then $25,000.  Is that correct?

25   A.  Yes.

1    Q.  Okay.  And with respect to Ms. Kim, she also -- her

2    Emperor purchases all occurred in December 2013; is that

3    correct?

4    A.  Yes.

5    Q.  Okay.  And we're looking here at Government's 57.

6              THE REPORTER:  Has this been admitted?

7              MS. FORD:  Yes.

8    Q.  Can you tell the jurors what they're looking at?

9    A.  You can see the bottom left of the check.  It says

10   Michelle Kim.  That's who purchased the cashier's check

11   or official check.

12   Q.  Right there.

13   A.  And it's payable to Infinity 2 Global and the amount of

14   this check is $20,079.80.

15   Q.  And that was deposited in one of the Infinity 2 Global

16   bank accounts here in Owensboro?

17   A.  Yes.

18   Q.  Okay.  And the other purchase of Emperor positions that

19   Ms. Kim made -- I'm going to show you Government's 58.  Do you

20   recognize that?

21   A.  Yes.

22   Q.  And what is that?

23   A.  It's also an official check from Citi Bank.  The

24   remittor -- person purchasing the check is Michelle Kim.

25             MR. SEWELL:  This has been admitted as well.  And

1    Cristy has them loaded if you want to do it through Trial

2    Director if that would be easier.

3    BY MS. FORD:

4    A.   Okay.   Sorry.   So this is an official check from Citi

5    Bank.   The remittor at the bottom you can see is Michelle Kim

6    payable to Infinity 2 Global.   The amount of the check is

7    $100,399.

8    Q.   Okay.   So like we discussed yesterday, this would be the

9    purchase of 20 Emperor positions if my math is correct?

10   A.   Yes.

11   Q.   Okay.   We also looked at -- I think we kind of ended the

12   day when we were talking about towards the end of 2014 there

13   were some wire transfers into -- Infinity 2 Global and Finance

14   Ventures had rebranded and changed their name to Tech

15   Entertainment; G1E.   Is that right?

16   A.   Yes.   G1E.

17   Q.   And there were still Emperor positions being sold?

18   A.   Yes.

19   Q.   Okay.   And you saw evidence of Emperor positions being

20   sold as late as November 25, 2014; is that correct?

21   A.   Yes.

22          MS. FORD:   Okay.   Judge, if I could approach the

23   witness again?

24          THE COURT:   Yes, ma'am.

25   Q.   I'm going to show you what's been marked Government

1    Exhibit 63A and B.  Do you recognize those?

2    A.  Yes.

3    Q.  Okay.  What do you recognize those to be?

4    A.  These are bank statements from Chase Bank for Heartbeats

5    Worldwide, account in that name, a page from the month of

6    October and a page from the month of November 2014.

7             MS. FORD:  Judge, I'd move to admit.  These are

8    certified business records and I would move to 63A and B.

9             THE COURT:  Without objection they'll be admitted.

10            (Government Exhibits 63A and B admitted in

11   evidence.)

12   Q.  Special Agent McClelland, do these -- do 63A and B show

13   the transfer -- the transfer of $15,000 to Scott Majors,

14   Heartbeats Worldwide, for the purchase of three Emperor

15   positions in November of 2014?

16   A.  Yes.

17   Q.  And then 63B shows the subsequent transfer into the Tech

18   Entertainment account here in Owensboro?

19   A.  Yes.

20   Q.  And that -- the transfer occurred actually on November

21   25th of 2014?

22   A.  Yes.

23   Q.  Okay.  I want to ask you about -- if we could pull up for

24   the witness Government 596.

25            MS. FORD:  Just for the witness.

1    Q.  We talked a lot about -- about a lot of email yesterday

2    and I don't -- I just have one or two that I'm going to ask

3    you about this morning.

4    A.  Okay.

5    Q.  So I'm taking you back to the email that was obtained from

6    Mr. Maike's email account.  Do you recognize Government's 596?

7    Just take a minute to read through it.

8    A.  Yes.

9    Q.  Do you recognize that?

10   A.  Yes.

11   Q.  All right.  That come from the search of Mr. Maike's

12   email?

13   A.  Yes.

14              MS. FORD:  Okay.  Judge, I'd move to admit

15   Government 596.

16              MR. WISENBERG:  May we be heard, Your Honor?

17              THE COURT:  Yes.

18              (Bench conference on the record.)

19              MR. WISENBERG:  Your Honor --

20              THE COURT:  Hold on one second, please.  Just

21   waiting for Mr. Meyer to get his -- all right.  Thank you.

22              MR. SEWELL:  Judge, you have a copy in the binder

23   that we gave you.  It would be in Volume 2 with all the

24   emails.

25              MR. WISENBERG:  Your Honor, I object to the

1    bottom -- the first email in the chain coming in because it --

2    it includes, you know, clear hearsay statements, so I would

3    ask for either that email to be taken out or, again, a strong

4    instruction by the court that the document is not to be

5    considered for any statements or accusations.

6            You got somebody in here calling it a -- you know,

7    calling it a pyramid, so I understand they want to get it in

8    for notice purposes, but there should be an instruction with

9    this.

10           MR. MEYER:  I would object on hearsay grounds to the

11   whole thing.

12           THE COURT:  All right.  The bottom part of it is a

13   complaint --

14           MS. FORD:  Yes, sir.

15           THE COURT:  -- and the purpose of the introduction

16   is to show notice to Ms. Hosseinipour and then also to --

17           MS. FORD:  Mr. Maike.

18           THE COURT:  -- Mr. Maike.  Okay.  Very well.  We'll

19   let you admit it.

20           MS. FORD:  Thank you, Judge.

21           (End of bench conference.)

22           MS. FORD:  Judge, may Government 596 be admitted?

23           THE COURT:  Yes, it may.  And published to the jury,

24   please.

25           (Government Exhibit 596 admitted in evidence.)

1          MR. WISENBERG:  And, Your Honor, may we have that

2    instruction as well?

3          THE COURT:  Yes.  This is an email and it contains

4    some statements from apparently Mr. Edwards.  You're only to

5    consider this email for the purposes of showing that a

6    complaint was made but not the factual allegations contained

7    in Mr. Edwards email and to show that notice was given to

8    Ms. Hosseinipour and Mr. Maike about this complaint.

9          MS. FORD:  Okay.  Cristy, if you could, highlight

10   the bottom half of that email, please?  All right.

11   BY MS. FORD:

12   Q.  And Special Agent McClelland, could you tell us what we're

13   looking at?

14   A.  This is an email from Tim Edwards to Faraday Hosseinipour.

15   Q.  Okay.  And what's the date of the email?

16   A.  May 3, 2014.

17   Q.  Okay.  And would you please read the text of the email?

18   A.  Sure.  It says, "Sorry.  This is like an everyday all day

19   deal.  People keep asking what the heck they get for their

20   starter kit; what products?  It's a product bonus, so what

21   products are in the kit?  Also the autoship.  What does the

22   autoship pay for?"

23          "If you're not a gamer outside the U.S. using chips,

24   there's no established value in exchange for payment.  I had

25   two great MLM guys close and they both bailed because without

1    a designated product or value for the kit and autoship, it's

2    really a pyramid.  We have to get Rick to designate something

3    of value for this cost."  Then a little smiley face.

4    Q.  Okay.  And let's look at the top half of that email.  The

5    original -- the email at the bottom had been sent to

6    Ms. Hosseinipour and what -- the top of Government's 596, what

7    does that show?  What does she do with the email?

8    A.  She then is forwarding this email to Angela Leonard and to

9    Rick Maike and subject line is, forward, "More questions."

10   Q.  And what date did she send it?

11   A.  May 4, 2014.

12   Q.  Okay.  And would you read the text of the rest of the

13   email, please?

14   A.  Yes.  "Angela, I know this will come in time, but anything

15   you can share in terms of time frame of establishing some

16   definite product values on what people are getting per package

17   and per autoship.  I'm not particularly concerned as I know it

18   will be established; however, it is a recurring concern or

19   question with some.  Obviously social casino can allocate an

20   autoship value with tokens, but if there's -- something is

21   coming with the different technology values, please let me

22   know.  Thanks, Faraday."

23   Q.  But "if something is coming with differing technology

24   values, let me know."  Okay.  And this is May of 2014?

25   A.  Yes.

1    Q.  Okay.  Special Agent McClelland, we talked yesterday about

2    the search warrant that you did in January of 2015 and you

3    found on Mr. Maike's computer a spreadsheet of Emperor

4    positions that had been sold through December of 2014?

5    A.  Yes.

6    Q.  Do you remember that?

7    A.  Yes.

8    Q.  Okay.  And you also had looked at the payments made out to

9    members through Global Gateway Payroll; is that correct?

10   A.  Yes; commissions that were paid.

11   Q.  Okay.  To anybody who had signed up or bought a position

12   in i2G?

13   A.  Anyone who'd earn a commission, yes.

14   Q.  Okay.  And based on those records that you had and that

15   analysis, did you prepare a summary chart that showed how many

16   Emperors had made a profit on their $5,000 purchase through

17   December 31, 2014?

18   A.  Yes.  It showed anyone who had made essentially back more

19   than at least the 5,000 that they had put in to purchase the

20   position.

21          MS. FORD:  Okay.  And if we could pull up just for

22   the witness, please, because it's not been admitted Government

23   232.

24   Q.  Do you recognize that, Agent McClelland?

25   A.  Yes.

1    Q.  Okay.  Is that the chart that you prepared?

2    A.  Yes.

3           MS. FORD:  Okay.  Judge, I would move to admit

4    Government's 232.

5           MR. WISENBERG:  May we be heard?

6           THE COURT:  Yes.

7           (Bench conference on the record.)

8           THE COURT:  Yes, sir?

9           MR. WISENBERG:  I would object because it's

10   presupposing that these people considered the $5,000 an

11   investment rather than a purchase of the Touch and the right

12   to participate in the online casino.

13          MR. MEYER:  I would just renew my previous objection

14   which the court overruled; evidence concerning the entire

15   organization and the -- well, you know, the earnings

16   associated with that are irrelevant and overly prejudicial.

17          THE COURT:  All right.  That objection is overruled.

18   You may proceed.

19          MR. WISENBERG:  I join in.

20          MS. FORD:  Thank you, Judge.

21          (End of bench conference.)

22          MS. FORD:  Judge, may 232 be admitted and published?

23          THE COURT:  Yes.

24          MS. FORD:  Thank you.

25          (Government Exhibit 232 admitted in evidence.)

 1    BY MS. FORD:

 2    Q.  Agent McClelland, can you explain for the jury this chart

 3    that you prepared and what they're looking at?

 4    A.  Yes.  So like you were asking me, there was a spreadsheet

 5    that we got from a search warrant that listed the Emperor

 6    positions as of the end of December 2014.  So taking that

 7    spreadsheet -- some of those people had multiple Emperor

 8    positions, so if you -- what I did is take the number of

 9    people actually, so it was less than the 4,000 or so entries

10    that were on that spreadsheet.

11    Q.  So, for example, we've already talked about Michelle Kim

12    who apparently bought at least 20 Emperor positions.

13    A.  Right.  So she'd just be one entry on this chart.  She's

14    one person.

15    Q.  She's one person?

16    A.  So what I wanted to know was of the people who put money

17    in and bought Emperor positions, how many people made money

18    who came away with more than $5,000.  And I looked at the

19    spreadsheet that showed the commissions that were paid because

20    this is how people were getting money back and then I had

21    to -- so you had to make at least more commission than you

22    paid in.

23         So in Michelle Kim's case, she would have to make

24    back at least a hundred and some odd thousand before she would

25    be in a profitable state, so I just simply did that

1    calculation.  And in the first line on this chart shows people

2    who did not make back money, essentially lost money, and that

3    was 2,671 people.  People who made between 0 and $5,000,

4    pretty small there, but it's around 40 -- I think it's 43.  A

5    little bit -- there you go.  Yeah, 43 people made back a

6    profit of up to 5,000.  Thirty-two people made between 5,000

7    and 50,000, and then seven people made between 50 and a

8    hundred, and then there was only four people who made over

9    500,000.

10             MR. WISENBERG:  Your Honor, may we be heard on this?

11             MR. MANNING:  Can we be heard on this real quick?

12             THE COURT:  Okay.  I didn't know what this meant.

13             MR. MANNING:  I apologize.

14             THE COURT:  The word "objection" is frequently used.

15             (Bench conference on the record.)

16             MR. MANNING:  Sorry.  I didn't have the mic close

17    enough for the objection part.

18             THE COURT:  All right.  Thank you.

19             MR. MANNING:  Your Honor, on this chart that he's

20    explaining, there's another chart that they have that he basis

21    this on and it's something that the government has as Exhibit

22    101I that shows clearly this chart is inconsistent with what

23    happens here because you got people --

24             THE COURT:  You want to go ahead and move to

25    introduce another chart?  You'll have your chance to

1    cross-examine, okay?

2           MR. MANNING:  Okay.

3           MR. MEYER:  Your Honor, I would -- now that the

4    testimony's come in, I mean, I do object -- I also object

5    on -- that it's not an appropriate summary chart because it's

6    extrapolating -- it's using the term "profit" to connote

7    whether or not -- so the people who have zero on that list are

8    people who made money.

9           So, for example, if the lady he just mentioned had

10   earned $90,000 in commissions, she's being listed as zero.

11   That's not a summary chart.  When I looked at this and was

12   reviewing it over the last couple of days, I assumed, you

13   know, frankly it was -- it was a -- it was a summary of the

14   underlying evidence.  This is not.  This is him making

15   calculations.  It is not summarizing voluminous documents

16   which would include, you know, summarizing material that is on

17   the documents, so --

18          THE COURT:  You may cross-examine the witness.  I

19   understand that you don't like what he has measured here, but

20   the chart -- he's described what it shows.  If the objection

21   is to relevance, it's overruled.

22          MR. MEYER:  My objection is it doesn't satisfy 1006.

23   It should be used demonstrative -- as a demonstrative exhibit,

24   not as a document that's introduced to the jury.

25          THE COURT:  All right.

 1              MR. WISENBERG:  We join in that.

 2              THE COURT:  The objection's overruled.

 3              (End of bench conference.)

 4    BY MS. FORD:

 5    Q.  So when you were looking at -- you said you looked at

 6    commissions paid out.  Over what period of time were you

 7    looking at commission payouts?

 8    A.  All the way through the end of 2014.

 9    Q.  Okay.  Special Agent McClelland --

10              MS. FORD:  If I could have one moment, Your Honor.

11    Special Agent McClelland, I have no further questions for you.

12    Thank you.

13              THE COURT:  All right.  Mr. Wisenberg, do you have

14    any questions?

15              MR. WISENBERG:  I do.  But before that, I'd like to

16    approach the bench.

17              THE COURT:  All right.

18              (Bench conference on the record.)

19              MR. WISENBERG:  For the record, Your Honor, for all

20    the reasons we have objected throughout the testimony of this

21    witness, particularly the extensive what amounts to summary

22    narrative-type testimony -- testimony not only of how the

23    investigation began but its continuing course and testimony

24    that included hearsay -- we would move to strike

25    Mr. McClelland's entire testimony --

1           THE COURT:  No, ma'am.  You may not laugh.

2           MS. FORD:  Sorry.

3           MR. WISENBERG:  We move to strike his entire

4    testimony and to instruct the jury to disregard it.

5           THE COURT:  Assuming the other defendants join in

6    this objection?

7           MR. MEYER:  Sure.  Why not, Your Honor.

8           MR. MANNING:  Yes.

9           THE COURT:  Ms. Ford, would you care to respond

10   before I overrule the objection?

11          MS. FORD:  No, sir.

12          THE COURT:  All right.  The objection's overruled.

13   Now, clearly the whole narrative "This is the way things are

14   presented to the grand jury" nature of this objection, I think

15   this witness from what I've heard has primarily gone through

16   the documentation he found and explained that the information

17   that he located, the financial records, the emails, these

18   checks and so forth, so -- the objection's overruled.  You may

19   continue with cross-examination.

20          MR. WISENBERG:  One more item 'cause I don't know if

21   this was done yesterday.  We would move to admit the entire --

22   the entire tape -- the entire recording of the interview of

23   Mr. Maike yesterday that the Judge allowed the jury to hear

24   under rule of completeness.  It's already a government

25   exhibit.  I don't know if the shorter tape was in, but we

1    would move -- and we'll put an exhibit number on it.  We would

2    move to admit the entire tape.

3              MR. SEWELL:  That's done.

4              THE COURT:  I thought it was too.

5              MR. WISENBERG:  Oh, okay.

6              THE COURT:  It's been admitted.  That's why we

7    played it for the jury.

8              MR. SEWELL:  One exhibit has the entirety of what

9    the jury heard.

10             THE COURT:  And what exhibit number is that, please?

11             MR. SEWELL:  Exhibit 169.

12             THE COURT:  Okay.  All right.  Thank you.  You may

13   proceed.

14             (End of bench conference.)

15             MR. WISENBERG:  Your Honor, could you give us a few

16   moments just to -- per the court's earlier instructions to

17   provide copies of some documents we'll be showing the

18   witness --

19             THE COURT:  All right.

20             MR. WISENBERG:  -- for both the court and the

21   witness.

22             THE COURT:  Do you-all want to stand for a moment?

23   I will say right now, I'm hopeful that we may go till

24   lunchtime.  So I'll tell you what, let's take ten minutes.

25   We'll give you-all a quick chance to use the bathroom if you

1    need to and hopefully we'll go through till noon.  Let's take

2    ten minutes.  I'm not leaving here, so we will start back at

3    10:30, all right?

4              COURT SECURITY OFFICER:  All rise for the jury.

5              (Jury out.)

6              (Recess at 10:21 a.m. until 10:27 a.m.)

7              (Cross-examination by Mr. Wisenberg previously

8    filed.)

9              THE COURT:  Mr. Meyer, do you have any questions?

10             MR. MEYER:  Yes, sir.

11             THE COURT:  I could tell you did.

12                       CROSS-EXAMINATION

13   MR. MEYER:

14   Q.  Kenyon Meyer.  I represent Doyce Barnes.

15   A.  Good morning.

16   Q.  Sir, just to make clear what we're talking about a few

17   minutes ago, the company -- Mr. Maike filed a lawsuit totally

18   separate from this case -- filed a lawsuit against Chuck King,

19   right?

20   A.  Yeah.  I'm not familiar with that much at all.  I mean,

21   I'm aware of it, but if you're going to ask details about the

22   lawsuit --

23   Q.  I'm not.  I just want to make sure we're talking about

24   restraining order and making sure we understand what we're

25   talking about.  There was a civil lawsuit where the company,

1    i2G and Mr. Maike, sued Chuck King for defamation, correct?

2    A.   I think, yeah, they were trying to get his videos off the

3    internet.

4    Q.   And did you go -- did you participate in any way in that

5    case?

6    A.   In the civil case?

7    Q.   Yes.

8    A.   No.

9    Q.   Did you ever tell any i2G participants when you talked to

10   them that you were trying to help get their money back for

11   them?

12   A.   Yes.

13   Q.   Mr. Maike entered a licensing agreement around May 13,

14   2013, to use a computer application program which ultimately

15   was labeled as the i2G Touch with a company called Qubeey,

16   correct?

17   A.   Yes.

18   Q.   And you've looked at that contract in your investigation,

19   correct?

20   A.   Yes.

21   Q.   Okay.  I'd like to show you a document that I'm going to

22   mark as Barnes Exhibit 46.

23          MR. MEYER:  Judge, I'm sorry.  I don't have a copy.

24          THE COURT:  That's fine.

25   Q.   Sir, is that a copy of the Qubeey contract that was signed

1    by i2G?

2    A.  Well, it's not signed.

3    Q.  Do you remember looking at the emails --

4              THE COURT:  Excuse me, sir.  It's marked?

5              MR. MEYER:  Yes, sir.  46.  Barnes 46.

6              THE COURT:  Okay.  Thank you.

7    BY MR. MEYER:

8    A.  The only reason I'm hesitating when you ask is this the

9    contract, I have seen a contract.  I just don't remember it

10   having the name "Qubeey" like that on the top, so I don't know

11   if the version I saw was a different one or -- but I am aware

12   there was an agreement with Qubeey, but I don't know if this

13   is the one I saw or not.

14   Q.  Let me show you -- I'm going to give you another document

15   that I'm going to mark Exhibit 47.  For the record, this is

16   Yahoo 5754 but I've marked it Barnes Exhibit 47.  And then I'm

17   going to show you one more document that's marked Barnes 48.

18             MR. MEYER:  I'm sorry.  I think one of those copies

19   was for the government and then this is Mr. Barnes 48 which is

20   Yahoo 5752.

21   Q.  And if you could just take a look at those three emails

22   and see if that gives you the ability to tell us whether or

23   not you've seen these documents.

24             MS. FORD:  Mr. Meyer, what numbers did you put on

25   the --

1          MR. MEYER:  Yeah.  Forty-six is the contract as a

2     whole, 47 is the signature page, and 48 is the cover email.

3          MS. FORD:  Thank you.

4     BY MR. MEYER:

5     A.  Okay.

6     Q.  Do you recall seeing an email from Harold Mack of Qubeey

7     forwarding a contract that -- and then -- also attaching a

8     one-page signature page?

9     A.  I got to say I don't.  That doesn't mean -- I'm not saying

10    it isn't what it is.  Seems like I remember seeing the

11    contract possibly from the search warrant records, but like I

12    said, there's tens of thousands of emails, so -- it was in

13    the -- clearly it is in the email group that I received and

14    reviewed from what you've given me.  If you're asking me if I

15    remember reading this email, I don't.

16    Q.  If this is a true and accurate copy of something that was

17    in the Yahoo emails -- just so we understand.  The search

18    warrant was executed for Rick Maike's email account, correct?

19    A.  Right.

20    Q.  So when we're talking about Yahoo emails, you got Rick

21    Maike's emails, and if he sent something to somebody or if he

22    received something from somebody, you guys got it for a

23    certain period of time, correct?

24    A.  That's right.

25    Q.  You didn't get all Yahoo emails anywhere; just Rick

1    Maike's?

2    A.  Right.

3    Q.  Okay.  So if this is true and accurate copies of

4    attachments the Qubeey representative sent to Mr. Maike, do

5    you have any reason to dispute that these are the contracts

6    that were executed by the parties?

7    A.  No.

8            MR. MEYER:  Okay.  I'd move to introduce

9    Government -- or Doyce Barnes Exhibits 46, 47, and 48.

10           THE COURT:  Without objection, they'll be admitted

11   assuming there's not an objection because I didn't hear one.

12           MS. FORD:  To which ones?

13           THE COURT:  46, 47, 48.  I only say that because

14   just had a look on Ms. Ford's face like she was getting ready

15   to say something but then she didn't, so -- all right.

16   They'll be admitted.

17           MS. FORD:  I'll ask questions about them, Judge.

18           THE COURT:  That's fine.

19           (Barnes Exhibits 46, 47, and 48 admitted in

20   evidence.)

21           MR. MEYER:  If they want to go second guess and look

22   at it, then --

23           THE COURT:  That's fine.  They'll be admitted.

24   BY MR. MEYER:

25   Q.  Just so the jury know what we're talking about, this is

1    the cover email -- and we can show this to the jury -- from

2    Harold Mack to Rick Maike and there was some back and forth

3    and he says, "I have made the adjustments.  I'm sending you

4    the agreement and sending the signature page separate because

5    it's no need to scan all those pages and you can do the same,"

6    correct?

7    A.  Yes.

8    Q.  And then we have the Qubeey intellectual property license

9    agreement which is 46, correct?

10   A.  Yes.

11   Q.  And then we have a signature page by Mr. Mack,

12   Harold Mack, correct?

13   A.  Yes.

14   Q.  And I want to ask some questions about the contract.  Have

15   you ever read the contract?

16   A.  I believe I have, yes, a while ago.

17   Q.  I'm only going to ask about a few parts of it.  First of

18   all, there was an agreement to -- for Qubeey to provide i2G

19   with something that the contract referred to as the Qubeey

20   platform, correct?

21   A.  Yes.

22   Q.  And that included different features of the Qubeey

23   product, correct -- the Qubeey software?

24   A.  Yes.

25   Q.  Like the Qubeey Cube, the Qubeey channels, the Qubeey

1    services, the Qubeey software, the Qubeey products, the Qubeey

2    applications, the Qubeey marks, and Qubeey's confidential

3    information, correct?

4    A.   Yeah.   What page is that?

5    Q.   It's just right here.

6    A.   Oh, gotcha.

7    Q.   Oh, I'm sorry.  You've got a hard copy.  It's page two if

8    you want to look at it.

9    A.   I can see that.

10   Q.   And then also there's an agreement to provide the Qubeey

11   social media site to i2G, correct?

12   A.   Yes.

13   Q.   And this was -- you referred to the Plus-Five agreement as

14   a white label agreement.  This was the same sort of agreement,

15   correct?  You had a software manufacturer and the contract was

16   that the software manufacturer's going to provide all these

17   features, cause it to have a different package level, you

18   know, presentation to the public so that i2G could use its

19   network to market it externally, correct?

20   A.   Yes.

21   Q.   Okay.  And then if you look at page 4.  2.4.  There was an

22   agreement to -- for Qubeey to provide to i2G the ability to

23   create its own channels through this software, correct --

24   video channels to be able to live broadcast to people,

25   correct?

1     A.   Yes.

2     Q.   And by the way, I'm going to ask you a question separate

3     from this document 'cause you met with Rocky Wright; the only

4     person in this courtroom that ever met him, correct?

5     A.   I have no idea.  I think Mr. Maike has.

6     Q.   Good point.  Did you ever actually use the i2G -- or the

7     Qubeey software?

8     A.   No.

9     Q.   Did you ask him to show it to you when you met with him?

10    A.   No.

11    Q.   Did you ever get online and -- have you ever heard of

12    Wayback Machine on the internet?  You can get on and look at

13    prior versions of websites that aren't currently on the

14    internet; the Wayback Machine?

15    A.   I haven't done that.  I guess I'm showing my age, but no.

16    Q.   Have you ever -- did you ask him if he could let you look

17    at it or use it?

18    A.   I met him in a hotel lobby, so that wouldn't have been

19    appropriate.

20    Q.   Did you ever talk to Marcus Feather?

21    A.   I don't believe so.

22    Q.   Do you know who Marcus Feather is?

23    A.   The name is vaguely familiar as being in some emails, but

24    I don't know who he is.

25    Q.   Do you -- did you ever ask to look at or subpoena or

1    execute a search warrant to be able to look at the database

2    that operated the G1E Touch, the G1E Touch, that was created,

3    the evidence has been, by Marcus Feather?

4    A.  No.

5    Q.  Did you ever execute a search warrant or send a subpoena

6    to get access to the intellectual property that operated the

7    i2G Touch?

8    A.  A subpoena for what, the --

9    Q.  For the intellectual property; the database that operated

10   the i2G Touch?

11   A.  I'm not sure a subpoena would give me that, but -- no, I

12   didn't.

13   Q.  Well, did you ever send a subpoena to bBooth or to -- you

14   talked to Rocky Wright, correct?

15   A.  Like, less than a year ago.  Well, yes.  I talked to him

16   several times during the case, yes.

17   Q.  Did you ever send a subpoena to a company named Verb or

18   company named bBooth or to Rocky Wright himself compelling

19   them to produce to the FBI the database that was the --

20   provided the intellectual property that operated either Qubeey

21   and/or the Touch?

22   A.  No.  The company was in bankruptcy by the time I got to

23   that, so --

24   Q.  BBooth was in bankruptcy?

25   A.  Qubeey was, yeah.

1    Q.   What about bBooth?

2    A.   I don't know -- I never heard the name bBooth before.

3    Q.   He told you about Verb, though, didn't he?

4    A.   Told me about what?

5    Q.   Verb, V-E-R-B.

6    A.   He may have.  It's been years since I talked to him,

7    but --

8    Q.   Okay.

9    A.   There were -- I don't know if this will be helpful in

10   answering.  There were --

11   Q.   I'm sorry?

12   A.   I guess if you're asking what I did look at in terms of

13   the --

14   Q.   I'm asking what you didn't do.

15   A.   Oh, okay.

16              MS. FORD:  Your Honor, may we be heard, please?

17              THE COURT:  Yes.

18              (Bench conference on the record.)

19              THE COURT:  Yes, ma'am?

20              MS. FORD:  Judge, this goes directly to that -- the

21   case law that Mr. Sewell provided to defense counsel and to

22   the court earlier today.  It's not relevant what the defendant

23   didn't do and Mr. Meyer's last question illustrates that's

24   exactly what we're doing; we're asking the agent what you

25   didn't do.

1          THE COURT:  All right.  Mr. Meyer?

2          MS. FORD:  And he's asking about events that

3    occurred long after the time frame of the conspiracy.

4          THE COURT:  He never looked at the i2G in operation

5    and asked for the software.  I understand.  Mr. Meyer?

6          MR. MEYER:  Yeah.  The absence of proof is often

7    critical to establish reasonable doubt.  If they -- this --

8    they have indicted these defendants alleging certain things

9    about the Touch and I can establish the fact that there is no

10   proof regarding certain critical issues.  I mean, this is the

11   only way to -- this is the guy.  He would know if -- and the

12   jury can hear that they don't have proof.

13         MS. FORD:  We already offered proof through Jason

14   Reeves that during the time period that the company was

15   promoting this product -- during the time period of the

16   indictment -- it didn't work.  Whether it was -- you know,

17   there was a kernel of an idea that somebody ten years after

18   the fact could develop into something is not relevant.  That

19   wasn't evidence that was available to this agent.  We're

20   talking about things that, you know, have occurred in --

21         THE COURT:  You're not going to allow an exhaustive

22   exploration of things not done in the investigation because

23   that's what the law says that I've been handed.  So you've

24   made your point and you may move on.  All of the things that

25   Agent McClelland did not do, you're not going to be able to

1    exhaust that subject.

2              MR. MEYER:  Your Honor, just for the future, I would

3    make a request to the government if they provide the court

4    with case law that they, number one, inform us that they are

5    providing the court with case law --

6              MS. FORD:  This was emailed to defense counsel by my

7    cocounsel last night exactly what we provided to the court

8    this morning.

9              MR. MEYER:  Then I apologize because I've got 150

10   emails I haven't looked at.

11             MS. FORD:  No, we wouldn't do that.

12             MR. MEYER:  I withdraw my complaint.

13             (End of bench conference.)

14   BY MR. MEYER:

15   Q.  Sir, do you have the contract still in front of you, if

16   you could turn to page five.  And Qubeey contractually agreed

17   to give i2G an exclusive for the network marketing, MLM

18   industry, to use its channel package as a product for sale

19   that will have commissions paid for its sale and use, correct?

20   A.  Where are you at there?

21   Q.  2.9, sir.

22   A.  Okay.  Yes, that's what it says.

23   Q.  And then at the bottom of that paragraph, there's an

24   agreement by i2G, correct, for this exclusive right to the

25   Qubeey channel package platform.  "Licensee agrees to place 50

1    thousand users on the Qubeey package platform within its first

2    12 months of operations and a hundred thousand users by the

3    end of its 24th month of operations.  Licensee also agrees to

4    keep a minimum 100 thousand users on the Qubeey channel

5    platform beyond the 24th month to maintain this exclusive use

6    for product agreement," correct?

7    A.  Yes.

8    Q.  So there are -- at the time they're contractually --

9    "they" meaning Mr. Maike and i2G was contractually committing

10   to eventually have a hundred thousand people using this

11   product, correct?

12   A.  Yes.

13   Q.  Okay.  And if you look at page 12, it was a three-year

14   contract, correct?

15   A.  Yes.

16   Q.  And then they also -- there was a feature list at the end

17   of this document.  And it's after the signature page if you're

18   looking at the hard copy, but -- and this is where Qubeey is

19   saying, "We are excited to present our platform offerings to

20   Infinity 2 Global.  Below is a list and description of the

21   features available for implementation in the custom branded

22   enterprise communication system that is being proposed for

23   utilization in your company."

24        "We are confident you will find an amazing amount of

25   value from leveraging this offering and that its value will

```
1    expand numerous aspects of your business.  We have tried to

2    suggest our ideas for how your company could best take

3    advantage of our platform; however, we know that you will know

4    much better than we will the best way to create added value

5    from the system.

6              Below we have presented a suggested strategy based

7    on our knowledge of the direct sales and affiliate marketing

8    business model of the more than 50 features that we have

9    available.  We have included a number of them that we feel is

10   applicable to the direct sales market."  Correct?

11   A.  Yes.

12   Q.  And then they say, "The features and pricing in this

13   document are provided to support the model that we have

14   learned from similar companies," correct?

15   A.  Yes.

16   Q.  And then, you know, they go on to describe the different

17   packages they're making available on page 19 and 20, correct?

18   A.  If you can flip to 20 --

19   Q.  Oh, sorry.  The affiliate, customer package, corporate

20   package, company package?

21   A.  Yes.

22   Q.  And then on the next page there is a -- and I'm not going

23   to go through them all, but there is a list of the recommended

24   features that they were indicating would be available in the

25   Touch, correct?
```

1    A.  Yes.

2    Q.  Realtime notification system, social aggregation and

3    interaction interface, API integration, video chat, live

4    video, audio chat, and other features, correct?

5    A.  Yes.

6    Q.  And then finally one other thing they agreed in their

7    contract of negotiations was for customer support.  "We will

8    train Angela and she will provide support to the company,"

9    correct?

10   A.  Yes.

11   Q.  And we've talked about you've seen the fact that i2G paid

12   money to Rocky Wright from time to time during their

13   relationship, correct?

14   A.  Yes.

15   Q.  There were subsequent payments -- additional payments to

16   Qubeey in an attempt to add features to the i2G Touch

17   application, correct?

18   A.  Add beyond those?

19   Q.  Yes.

20   A.  I wasn't aware there was any additional -- there was one

21   set of features.

22   Q.  Okay.  Well, let's look at your -- remember when you

23   did -- you filled out an affidavit and prepared an affidavit

24   to do a search warrant for i2G.com?

25   A.  A search warrant for i2G?

1    Q.   GoDaddy?

2    A.   The Yahoo email search warrant, is that --

3    Q.   No.  Do you remember doing a search warrant for GoDaddy?

4    A.   Yes.

5             MR. MEYER:  Okay.  And, Your Honor, I'm not going to

6    move to introduce this, but I would like the jury to see it so

7    they can see what we're talking about.

8             MS. FORD:  Well, I'd object to that.

9             THE COURT:  Objection sustained.  Just the witness.

10   BY MR. MEYER:

11   Q.   All right.  Sir, can you see this?

12   A.   Yes.

13   Q.   And this is a search warrant -- an application for a

14   search warrant you did in the matter of the search of

15   information associated with i2G.com and i2G Casino that is

16   stored at premises controlled by GoDaddy, Inc., correct?

17   A.   Yes.

18   Q.   If you will look at -- at the bottom of page 3, you -- and

19   you swore under oath just like the other affidavits, correct?

20   A.   Yes.

21   Q.   What is GoDaddy, by the way?

22   A.   So GoDaddy's a corporation that provides internet

23   websites, sort of -- I'm not a computer guy, but hosts -- it

24   hosts -- it was a host for i2G.com, majestycasino.com.  So

25   when we did the search warrant for the emails, we did a

1    corresponding one to GoDaddy which ended up producing almost

2    nothing, so -- but --

3    Q.   But regardless, in that affidavit you swore that Maike

4    subsequently made additional payments to Qubeey in an attempt

5    to add features to the i2G Touch application and to pay for

6    additional licensing fees, correct?

7    A.   Yes, that's correct.

8    Q.   Okay.  And the i2G Touch application was advertised

9    through the i2G web page, correct?

10   A.   Yes.

11   Q.   And although we've seen a lot of these applications and

12   various features, the way you have described your

13   understanding of the i2G Touch was it was an aggregator.

14   Social media sites like Twitter and Facebook could be combined

15   on a computer screen and pop-ups would come out, correct?

16   A.   Yes.

17   Q.   The software would allow social media communications to

18   occur in one place?

19   A.   Correct.

20   Q.   And you agree that the product had some intrinsic value?

21   A.   Yes.

22   Q.   The version of the software that was available for free at

23   one point from Qubeey was a basic version, correct?

24   A.   I think it was the same version.

25   Q.   I'm going to look at page 4 of the same affidavit that you

1    swore to in getting the search warrant.  And you wrote and

2    swore that the following was true --

3            MS. FORD:  Objection, Your Honor.  Objection.  Can

4    we be heard?

5            THE COURT:  Yes.

6            (Bench conference on the record.)

7            MS. FORD:  I have no objection if Mr. Meyer -- if

8    something was said that he needs to impeach with, but it's

9    not -- he's just reading from the affidavit.

10           THE COURT:  I thought that's consistent with what

11   the witness just testified to, but --

12           MR. MEYER:  No.  It says -- he says in there it was

13   a basic version.

14           THE COURT:  All right.  You may proceed.

15           MR. MEYER:  And, Judge, just as a matter of

16   presentation, unlike 302s or most impeachment this is an

17   admission of the witness, so I think in and of itself it would

18   be admissible -- substantively admissible, although I don't

19   want to burden the record with the hard copies.

20           I do think in light of that it's appropriate for the

21   jury to see the substantive statement and that's why I asked

22   if I could show it while I'm impeaching him or asking him

23   about certain portions of it.

24           THE COURT:  I'll let you go ahead and ask him about

25   it.

1              MR. MEYER:  Can the jury see it?

2              THE COURT:  No.

3              (End of bench conference.)

4    BY MR. MEYER:

5    Q.  In that affidavit you wrote, "The product has some

6    intrinsic value but a basic version of the software was

7    offered to the public for free through Qubeey's website,"

8    correct?

9    A.  Yes.

10   Q.  And at the time that you did the affidavit -- at the time

11   you testified at the grand jury, you thought that the charge

12   for the i2G Touch was $19.95, correct?

13   A.  That's correct.  Well, to get the i2G Touch, you had to

14   buy one of the business levels.  I think the levels was a

15   novice which was $400, I think, but in their promotional

16   information it said "Business software, $19.95," so people I

17   talked to including myself assumed that was for the Touch,

18   so that was my understanding.

19   Q.  Okay.  You've talked about -- in discussing these levels,

20   let's talk about the Emperor level which you I think told us

21   was, you know, the focus of your investigation.  Emperors

22   would pay $5,000 and get three things, correct?

23   A.  Yes.  Well, I don't know -- you want to say the three

24   things?

25   Q.  Sure.  I'll tell you the three things and you tell me

1    whether you agree.  They would get access to i2G virtual

2    products like the i2G Touch, the right to start an independent

3    business and build their downline and get paid through the

4    company pay plan, and the right to share in the casino

5    profits.

6    A.   I think they also were exempted from the monthly autoship

7    for a year, so they didn't have to pay a monthly fee where the

8    other positions required you to pay a monthly fee.

9    Q.   Okay.  They would have the right to earn commissions by

10   sponsoring other IBOs who would also get the right to use the

11   i2G Touch and they also had the opportunity to share profits

12   from the casino if they bought an Emperor level, correct?

13   A.   Yeah.  I think the other levels also shared in casino

14   profits but a smaller amount.

15   Q.   Okay.  And Mr. Maike was careful to state that people in

16   the United States could not gamble on the site, correct?

17   A.   Yes.

18   Q.   The i2G website stated, "We are offering a luxury

19   experience through our gaming platform for our overseas

20   markets only and an amazing benefits package for our U.S.

21   markets.  With that, this platform allows a wide range of

22   individuals to create their own home-based business while

23   having fun in our i2G social environment, online gaming area,

24   and use of our benefits package, correct?

25   A.   Yes.

1    Q.   I2G casino.com provided the contact information for
2    Plus-Five Gaming, correct?
3    A.   Yes.
4    Q.   And those games on the casino including -- included
5    traditional casino games such as roulette -- I can never say
6    it -- baccarat, blackjack, and slots?
7    A.   Yes.
8    Q.   So -- and the casino did generate money?
9    A.   Not for i2G.
10   Q.   It didn't in two months?
11   A.   When you say "generate money," I take that to mean a
12   profit; the company came away with more money at the end than
13   they started with --
14   Q.   Right.
15   A.   -- which it did not.
16   Q.   In two months it didn't?
17   A.   There were two months where it was positive.  The other
18   months it was negative, so in total it was negative.
19   Q.   Right.  It was generating revenue for the -- the casino
20   was generating revenue?
21   A.   The casino was, but i2G had to pay a monthly fee and
22   they -- except for two months -- never generated enough casino
23   revenue to exceed the minimum, so they had to pay money to
24   Plus-Five each month with the exception of two months; a very
25   small amount of money, I think.

1    Q.  Yeah.  We've been through this.  But $3,000 euro billed a

2    month and then they would spit it 70/30 and you would get

3    credit for what you made and you'd have to pay the difference,

4    correct?

5    A.  Correct.

6    Q.  And is it correct that the Plus-Five contract was signed

7    in March of 2013?

8    A.  Plus-Five contract?

9    Q.  Yeah.  The Plus-Five contract -- the contract between i2G

10   and Plus-Five?

11   A.  Yeah.  I don't remember the date, but --

12   Q.  Does this refresh your recollection?

13   A.  Assuming that is the contract, yeah.  March 21, 2013, it

14   was emailed from Rick Maike to Martin Burke -- martinburke@aol

15   and Al Setlin.  And I don't think Al Setlin and Martin Burke

16   are part of Plus-Five, so I don't know if -- I don't know.

17   Q.  It doesn't help -- doesn't help you --

18   A.  Doesn't really help me.

19   Q.  Is it fair to say that the contract with the casino was in

20   place before the promotion began for the company?

21   A.  I don't think that necessarily is true, no.  The first

22   payment to Plus-Five went out of Independence Bank account and

23   I know there was customer money coming in from North Carolina

24   at that time before that first payment was made, so I would

25   presume the contract hadn't been finalized yet.

1    Q.  Well, the contract provided for subsequent payments,

2    right, a series of payments?

3    A.  Right.

4    Q.  So you entered the contract, then they said you would pay

5    money in order to get --

6    A.  I suppose.  I don't know.  I don't know the date.

7    Q.  You don't know?

8    A.  Yeah.

9    Q.  So the Emperors were told they would share in 50 percent

10   of the casino profits and the number of Emperors was listed at

11   5,000, correct?

12   A.  Yeah.  That was the max they would sell, yes.

13   Q.  So the Emperor program itself did not allow for the

14   endless recruitment of Emperors, correct?

15   A.  That's correct.

16   Q.  And people who became Emperors were excited about it

17   because they thought the program was going to work, correct?

18   A.  I would assume so, yeah.

19   Q.  And you agree that the concept of a multilevel marketing

20   company sharing the profits of an online casino with its

21   members was unique?

22   A.  Yes.

23   Q.  A grand juror asked you the following question, correct:

24   "So the promoters, not Mr. Maike and his wife, that clearly --

25   well, I mean, the promoters profited also, but how do we know

1    the promoters didn't believe what they were saying?"  Do you

2    remember that question being asked to you?

3    A.  I don't, but I take you -- I'm sure it was.

4    Q.  And you thought that was a good question.  You told them

5    "That's a good question"?

6    A.  Yeah, that is a good question.

7    Q.  And ultimately you said to answer your question, "Did they

8    know if the casino was making money?  There's a chance they

9    didn't know exactly how much it was making or not.  I don't

10   know that they" -- "I don't know that they knew for sure."

11   Correct?

12   A.  That's right.

13   Q.  And because through your investigation the only people who

14   were getting access to the monthly casino figures were

15   Mr. Maike and Mr. Flener, correct, and Angela?

16   A.  That's where the records were in their office.  I would

17   assume the owners of the business were -- you know, Mr. --

18   Q.  Let's not assume.  Did you see emails showing each month

19   where the statements went?

20   A.  No.

21   Q.  You didn't see the emails?

22   A.  Oh, I'm sorry.  To -- I misunderstood you.

23   Q.  From Plus-Five to --

24   A.  Oh.  There were invoices each month, yes.  I saw those.

25   Is that what you mean?

1    Q.   Yeah.   The records going from Plus-Five to Angela and Rick

2    each month and then Rick or Angela would forward it to

3    Mr. Flener to pay on it?

4    A.   Yeah.   I saw invoices and then I would see wire transfers.

5    Q.   By email?

6    A.   I don't remember emails but there may be.   The form I got

7    them in was the search warrant.   There was a folder with all

8    the invoices and that's where we got the Plus-Five invoices

9    from.   Now, it could be on the Rick Maike email with a

10   thousand emails.   Those are duplicated in the emails and the

11   fact I already had them, I sort of passed over that.

12            So if you have emails -- I'm sure there are, but the

13   invoices themselves clearly do show -- if that's what you're

14   asking.   It's just Mr. Maike and Mr. Flener's office is where

15   those documents were going.   I don't see them being forwarded

16   to anyone else.

17   Q.   Okay.   So you were asked on direct testimony about the

18   Hong Kong account.   So were you unable to obtain copies of the

19   Hong Kong bank account records?

20   A.   Which ones?

21   Q.   Well, is there more than one Hong Kong bank account for

22   i2G Hong Kong?

23   A.   There's one in Mr. Maike's name and there's one in

24   Mr. Barnes' name and there's one in the company name.   So I

25   subpoenaed HSBC Bank which is where those accounts I'm aware

1   of were.  We got -- we did not get all the records from the

2   bank.  We got some statements from Mr. Maike's previous

3   attorneys, but -- and then I used the general ledger for

4   Mr. Flener.

5   Q.  My question is this:  So there was -- we've seen evidence

6   about a i2G Hong Kong entity that had a i2G Hong Kong entity

7   bank account?

8   A.  Yes.

9   Q.  Do you have all of the records from that bank account?

10  A.  No.

11  Q.  Okay.  Just a couple questions about Chuck King and his --

12  so initially Chuck King was a promoter of i2G; is that

13  correct?  I mean, he was an IBO, Chuck King, correct?

14  A.  Initially Chuck -- you have to meet Chuck King.  I

15  don't -- but his dealings with the company -- my understanding

16  and I didn't know him at this time was he had bought, I think,

17  a lower level position, maybe a novice or somewhere lower than

18  Emperor, and then had agreed to promote the business.  Is that

19  your question?

20  Q.  Yeah.  So the answer's yes?

21  A.  Yes, he was a promoter.

22  Q.  And he started a postcard program where he charged people

23  money to send postcards out on their behalf trying to get

24  people to sign up for i2G?

25  A.  Yeah.  And I'm not -- it was something like that, yes.

1    Q.  Okay.  And then the company stopped the postcard program,

2    correct?

3    A.  I'm -- you're -- I don't know.  I really don't.

4    Q.  That's fair.  Do you know whether or not he started

5    marketing his services and people paid him money to help them

6    get their money back?

7    A.  I think he did.

8    Q.  Okay.  And he even sold his services to help people file

9    arbitrations, correct?

10   A.  I think so, yes.

11   Q.  And one guy even paid him $19,000 to help him with his

12   arbitration, correct?

13   A.  I don't know if that's true.

14   Q.  Do you know whether or not he held himself out to be able

15   to help this -- a person in an arbitration, the arbitrator,

16   said "You're not a lawyer, you can't do it"?

17   A.  Yeah.  I remember -- I think you're referring to Peter

18   Herr who had bought multiple Emperor positions.  And the

19   process in the -- the company outlines in this disgruntle or

20   complaint was to go through arbitration as a solution, so I

21   think -- my understanding Mr. Herr was trying to follow that.

22   As to what Mr. King exactly did for him, I don't know.  I have

23   no idea.

24   Q.  So would you agree that executing the -- this search

25   warrant execution at Mr. Maike's home was bad for i2G's

1    business?

2    A.   The search warrant was?

3    Q.   Yeah.   I mean, the fact that the owner of the company has

4    a search warrant executed at his home related to his business

5    is bad for business, would you agree with that?

6    A.   We didn't shut down the company.   We left the company

7    accounts intact.   We did not -- we did our best to not

8    interfere with his business going forward because at that

9    point the business had morphed into travel packages and other

10   things that weren't part of our investigation, so I -- we were

11   trying to be as careful as we could because it did not appear

12   to be the same business that we investigated.   So would it be

13   bad for that business?   It shouldn't be because it had --

14   Q.   Really?

15   A.   Well, I mean, I don't know.   It wouldn't be good.   If I

16   was running a business, I wouldn't want to have a search

17   warrant executed, but I don't know if I would blame my

18   problems on the search warrant.

19   Q.   But my question's very simple:   Do you think you executing

20   a search warrant at Mr. Maike's home was bad for the business?

21   A.   I guess I would answer that to say it didn't affect the

22   business that in and of itself.

23   Q.   So I want to ask some questions about the emails -- or

24   some of the stuff we talked about yesterday with respect to

25   Mr. Barnes.   First of all, you would agree that in the search

1    warrant -- in light of Mr. Wisenberg's questions,

2    Mr. Barnes' name is not in the search warrant application,

3    correct?

4    A.  Yes, that's correct.

5    Q.  And in the case of Doyce Barnes, he was more of an owner

6    at the start with Mr. Maike, correct?

7    A.  Than what?  More of an owner than what?  More of an

8    owner -- I'm sorry.  I didn't understand your question.

9    Q.  Well, I'm reading your testimony.

10   A.  Okay.

11   Q.  Is it true that in the case of Doyce Barnes, he was more

12   than -- I think what you were saying is you were

13   distinguishing promoters from --

14   A.  Oh, gotcha.  Yes.

15   Q.  So in the case of Doyce Barnes, he was more of an owner at

16   the start with Mr. Maike, correct?

17   A.  Yes.

18   Q.  And you mentioned any money he was paid was outside of the

19   payroll structure?

20   A.  Yes.

21   Q.  And you -- we saw on some of these exhibits yesterday a

22   total of money paid to Mr. Barnes in which you did to create

23   that summary chart is simply go through the bank records and

24   see any check that was made to Mr. Barnes and add it up,

25   correct, during the relevant time period?

1    A.  Right.  It didn't include any credit card charges that he

2    benefited from, but other than that -- yes, it was checks and

3    wires that would have gone to him.

4    Q.  So it would include, for example, reimbursements or

5    repayments of loans.  You didn't get into is it -- you know,

6    analyzing his income; blah, blah, blah.  You just said,

7    "Here's how many checks he got during this particular time.

8    I'm going to add it up.  Here's what it was"?

9    A.  That's right.

10   Q.  All right.  And -- okay.  So yesterday there were some

11   exhibits -- and I actually don't have hard copies of all of

12   those, so I would request the United States to put some of

13   these documents up.  Sixty-five -- just for the witness

14   because this one has not been admitted.  657A and B.  United

15   States 657A and B.

16          While it's coming up, was there -- do you know

17   whether or not there was a merchant account that the company

18   had -- ever -- and what merchant account -- what the name of

19   it was?

20   A.  Yes, they had a merchant account.

21   Q.  Okay.  Let me stop you there which is unfair because I

22   asked you multiple questions, but do you remember if they had

23   one or more than one merchant account during the time that

24   we're talking about here; 2013 and 2014?

25   A.  I believe they had more than one.

1   Q.  Okay.  Do you know how many they had?

2   A.  I don't.

3   Q.  Do you know the name of any of the merchant accounts?

4   A.  I know the name of the company that ran the merchant

5   account was called Base Commerce at one point, but to name

6   them is a little confusing because it goes through a bank

7   account which isn't really the owner of the merchant account.

8           So I know Base Commerce was one that managed -- that

9   was a contractor to provide merchant account services and I

10  can't remember if that went through The Little Bank or a

11  different merchant account for The Little Bank which was in

12  North Carolina, but I guess to answer your question, I know

13  there was at least two merchant accounts and -- about as far

14  as I can go, I guess.

15  Q.  That's fair.  And at some point we've heard there were

16  problems with banks and that included at some point issues

17  with one of the merchant -- the first merchant account that

18  they had, correct?

19  A.  Yes.

20  Q.  Okay.  So let's look at 657A if we could bring that up

21  just for the witness.  Is this one of the documents you saw

22  yesterday?

23  A.  Yes.

24  Q.  Is this one of the emails you found in Mr. Maike's email

25  account?

1    A.   Yes.

2              MR. MEYER:  Okay.  I'd move to introduce 657A and B.

3              THE COURT:  Without objection --

4              MS. FORD:  No objection.

5              THE COURT:  -- it will be introduced.

6              (Barnes 657A and 657B admitted in evidence.)

7    BY MR. MEYER:

8    Q.   If we could put that up for the jury.  So this is dated

9    November 25, 2014, correct?

10   A.   Yes.

11   Q.   And it's an email between Ms. Stein and Rick Maike, Angela

12   Leonard and -- and Doyce Barnes' name isn't on any of the

13   emails on this piece of paper, correct?

14   A.   That's correct.

15   Q.   And then if we could go to 657B, we've got Global 1

16   Entertainment, Finance Ventures.  And Doyce Barnes is listed

17   there as vice president, hundred percent ownership, correct?

18   A.   Yes.

19   Q.   Okay.  So let's now go to 629A and B and that was

20   introduced and admitted.  And this is -- I think we're going

21   backwards in time, so this is August 13.  And this is an email

22   to Angela Leonard, the Barnes' kids email address, Rick Maike,

23   and it says RAJ applications.  And if we could go to section

24   B; 629B.  We've got -- somebody filled out this document with

25   information, correct?

1    A.  Yes.

2    Q.  And, again, it lists Doyce Barnes' name, hundred percent

3    owner.  It's got Rick Maike's name as the administrative

4    contact, correct --

5    A.  Yes.

6    Q.  -- his email, his phone number -- Rick Maike's phone

7    number.  Please go to the next page.  It's got Rob Flener's

8    name.  Keep going, please.  If you look in the lower

9    right-hand corner, that's an RM initial, correct?

10   A.  Yes.

11   Q.  And if we keep going to the signature page, please.  And

12   then we've got the name, Rick Maike, president, and then

13   that's Rick Maike's signature, correct?

14   A.  Yes.

15   Q.  Okay.  And Doyce Barnes' signature is not on there?

16   A.  That's right.

17   Q.  And then if we could go to 580A and B.  This is an email

18   going back in time; March 27, 2014.  And by the way, the

19   emails that we just looked at, you don't know whether or not

20   they were ever submitted to any company or whether or not

21   either of those companies became the actual merchant

22   processor, correct?

23   A.  Not as I sit here today.  I couldn't give you an answer on

24   that.

25   Q.  And then we've got March 27, 2014, and this is an email

1    from Angela Leonard and it says, "Doyce, please download,

2    sign, forward back.  The second merchant piece that is filled

3    out is the one I need signed."  So based on your review of

4    this, you would conclude that Angela Leonard filled out the

5    document, correct?

6    A.  Yes.

7    Q.  And you would agree that sometimes in life even retired

8    FBI agents who are, you know, very detailed oriented will do

9    things like get on a computer, it will ask you to agree to the

10   terms and conditions, and you will agree to it without reading

11   all of the terms and conditions, correct?

12   A.  Yes.

13   Q.  And have you ever purchased a home?

14   A.  Yes.

15   Q.  Have you ever been at a real estate closing and signed

16   documents without reading every word at the real estate

17   closing?

18   A.  Yes.

19   Q.  Okay.  And we don't -- well, let's go to the next page.

20   Again, Powerhouse payments, do you know whether or not this

21   was ever submitted or whether Powerhouse Payments ever

22   provided merchant processing agreements to Finance Ventures?

23   A.  I know they had a merchant account agreement that ran

24   continuous, but I don't know if this is the one.

25   Q.  Right.  And clearly they did because the bank account set

1    up ACH --

2    A.   Right.

3    Q.   And, again, this document that we know was filled out

4    presumably according to the email by Angela Leonard says,

5    again, Doyce Barnes -- I don't know if this one says his

6    ownership or not, but it's got Doyce Barnes in there and she

7    filled it all out --

8    A.   It does.

9    Q.   -- correct?  And then if we could finally go back in

10   time -- let me look at my notes really quickly before -- okay.

11   If we could go back to 505A and B.  And this is May 24, 2013,

12   so this is back in the kind of early days of the company,

13   correct?

14   A.   Yes.

15            MR. SEWELL:  Take this down, please.

16            MR. MEYER:  Pardon me?

17            MR. SEWELL:  So the only portions of this -- there's

18   a request from the defense to redact the top part of it.  So

19   let Cristy arrange it so that the top part is blocked.  She

20   can do that, but it needs to happen.

21            MR. MEYER:  Can I look at that for a second just for

22   the witness 'cause I may argue with them over that?

23            THE COURT:  Yeah.  April, I think, can do that.

24            MR. MEYER:  Your Honor, can we be heard on that?

25            THE COURT:  Yes.

 1                    MR. MEYER:  Actually, the -- I'd like to be heard on

 2       that, please.

 3                    (Bench conference on the record.)

 4                    THE COURT:  You're going to unredact it?

 5                    MR. MEYER:  Well, I think that the -- the objection

 6       was -- and I do respect the marital privilege and I think it's

 7       alive and well in the Commonwealth of Kentucky, but I guess my

 8       question is has it -- is this the first time that it has been

 9       asserted with respect to this document or was it -- did I get

10       it inappropriately somehow from the privilege stuff?

11                    MR. SEWELL:  My recollection is --

12                    THE COURT:  I thought this objection was made on

13       behalf of Mr. Maike.

14                    MR. MEYER:  Right.  It wasn't the government.  I was

15       really asking --

16                    MS. FORD:  I think the privilege has been waived.

17                    MR. MEYER:  Because it was produced?

18                    MS. FORD:  Yes.  It was produced by -- there's a

19       very tortured history to the production of the email, but

20       Mr. Wisenberg ultimately produced this.

21                    THE COURT:  Didn't we redact the top part of that or

22       is that a different document?

23                    MR. MEYER:  Your Honor, that's fine.

24                    MR. SEWELL:  I don't think Judge Stivers is aware of

25       the history of how the emails -- what they went through before

1    they arrived.  The reason there's a two-year delay before Dave

2    ever got the emails is there was -- I think it was actually

3    maybe longer than that, but many of them went through this

4    whole process.  A special master was appointed.  They were --

5    went through that whole process.  There is back and forth.

6         That's what caused years of delay in the case.  So

7    the whole purpose of that was to determine what was privileged

8    and what was not privileged.  There was chances to object

9    again and again.  At the end of all that process, that's what

10   happened here, so no -- so -- and that was to have discussions

11   of crime fraud exception and marital exception and all those

12   different types of things, so that's all been done.

13        MS. FORD:  And if I can add in response to

14   Mr. Meyer's question.  Mr. Maike's previous counsel -- so the

15   government turned over the entire production to defense

16   counsel at that time who was not Mr. Wisenberg.  There was a

17   change, but a privilege log was prepared asserting not just

18   attorney-client privilege but also spousal privilege over

19   emails.

20        And ultimately the special master was appointed and

21   reviewed and -- but because the emails were really in the

22   possession of defense counsel at that time, Mr. Maike's

23   counsel, ultimately anything that -- and the special master

24   did -- there are some emails we've never seen, but those that

25   were deemed not privileged, Mr. Wisenberg -- ultimately

1    Mr. Maike's counsel -- distributed to everybody and those are

2    the ones we've been using in trial.

3              MR. MEYER:  Is this one of those that was not --

4              MR. SEWELL:  All of them are.

5              MS. FORD:  All of them are.

6              MR. SEWELL:  The only way we got emails is through

7    Maike's counsel because --

8              MR. MEYER:  So I guess my question to Mr. Wisenberg

9    is in light of that, are you -- is he still asserting the

10   privilege?

11             MR. WISENBERG:  No.  I didn't -- I didn't realize --

12   when I did it, I saw it.  And if this is one of the ones that

13   went through the process, then I withdraw my objection.  It

14   was just out of an abundance of caution.  If this wasn't one,

15   I didn't want it to be considered some kind of a -- on future

16   waiver.  That's all.  Having learned that or forgotten it and

17   now relearned it, I withdraw my objection or my request for

18   redaction.

19             THE COURT:  All right.  It will remain unredacted

20   then.  You may proceed.

21   BY MR. MEYER:

22   Q.  This is an email dated May 24, 2013.  It's Mr. Maike

23   forwarding it to Angela.  There's Stephen Barnes' email

24   address and we got an attachment, if you could go to the

25   second page.  So would you -- can we agree that somebody other

1   than the person who signed this -- Doyce, who signed this --

2   filled out the rest of it by looking at the ink?

3   A.   I mean, I'm not saying that didn't happen.  I can't say

4   that.   I'm not a -- oh, you mean the ink itself is a different

5   color than the -- not the handwriting, necessarily?

6   Q.   Correct.

7   A.   I don't know.  It's a photocopy.  I can't really offer

8   much of an opinion on -- appears to be a different device

9   signed it than -- is that what you're asking or --

10  Q.   Yeah.   What I'm getting at is we can -- I mean, you could

11  look at this and conclude that somebody signed the document --

12  Doyce signed the document -- and that was a different human

13  being than actually wrote the rest of the stuff in the

14  document?

15  A.   Yeah.  I don't know.  I mean, I'd hate to bet the farm on

16  that, but --

17  Q.   Okay.  And have you, like, compared like, for example, the

18  "M" in this document with -- that was in the word "member"

19  with the "M" that was used in Mr. Maike's name in the

20  document -- in the signature where he signed 629A and B?

21  A.   Compared the signature?

22  Q.   Yeah.  So there's -- I mean, I think the answer's no, you

23  probably haven't done that.

24  A.   No, I haven't.

25  Q.   But you haven't looked at the -- like you haven't looked

1    at various letters and say, "Hmm, does it look like something

2    we know Maike wrote" to see if this is Rick Maike's

3    handwriting?

4    A.  We did that with the purported loan document to figure out

5    who may have signed that or not signed it, so I did do some of

6    that kind of, just -- I'm not an expert in that, so -- but

7    nonetheless, we all like to kind of do that to kind of get an

8    idea.

9    Q.  I'm just really asking about this document.  Did you do it

10   with this document?

11   A.  Well, there's only one signature on here, so I don't know

12   what you're asking.

13   Q.  I'm not talking about the signature.  My point is -- I'm

14   trying to advocate for the proposition that somebody else

15   other than Doyce filled out the form.

16   A.  Yeah.  I guess I'd like to see his printed handwriting to

17   compare it -- a signature you could use to compare it to

18   print, I would say, so -- I can't say.

19           MR. MEYER:  Is there a way to blow up that "M" in

20   "member"?  And then if we could go back to 629B and go to the

21   signature page.  And is there a way to blow up that "M"?

22   Q.  Anyway --

23   A.  It could be the same.

24   Q.  -- it is what it is, right?

25   A.  Yeah.  The jury can look at it too, I guess.  I don't

1    know.

2    Q.  So -- and this signature -- this document we're -- that

3    Doyce signed early on in May is the only merchant agreement

4    that you have with his signature on it -- that we've seen in

5    this period of time that was introduced yesterday?

6    A.  Yes.

7    Q.  Okay.  A couple additional questions related to

8    Songstergram.  So Rocky Wright wrote up a short one paragraph

9    agreement and emailed it to Mr. Maike saying that Mr. Maike

10   would invest $250,000 in Songstergram in exchange for

11   ownership in the company, correct?

12   A.  Handwritten -- was it a handwritten note or -- I don't

13   have it in front of me, but I do remember it seems like there

14   was some -- and I get confused because there was a similar

15   agreement with the ITT Touch software where you paid 13 in

16   cash for that.  But the Songstergram agreement, I don't know.

17   You'd have to show me, but I do agree there was an agreement

18   at some point, but --

19   Q.  Well, regardless of whether it was in writing or typed up,

20   do you -- can we agree that Mr. Wright wrote up a short one

21   paragraph agreement and emailed it to Mr. Maike for the

22   purchase of ownership interest in Songstergram for $250,000?

23   A.  Yes.

24   Q.  Okay.  And in fact, $250,000 was paid to Mr. Wright for 18

25   or 20 percent of the company -- Songstergram company, correct?

1    A.  Not for i2G to own it but for Mr. Maike to own it, yes.

2    Q.  Well, did you -- did Rocky Wright give you documents when

3    he met with you -- give you any agreements?

4    A.  No, I don't believe he did when we met.  Not that I

5    remember.  He -- if I -- he may have during some phone calls,

6    but those were not in person, so -- and I think we got some

7    records from the search warrant that we later showed to him,

8    but I don't think he gave them to us.

9    Q.  What is this set of documents that we've got that's U.S.

10   1232288?  It's a series of documents that have handwritten

11   numbers on it.

12   A.  Right.  So these are different documents mostly from -- I

13   can go through each one.  They were not provided from

14   Mr. Wright to my recollection.  They were generally received

15   from the search warrant.

16   Q.  So these are documents you gathered and then talked to him

17   about at some point?

18   A.  Yes.

19   Q.  Okay.  And then did he email you in December of 2014 and

20   send you an email saying this is the first time I emailed Rick

21   about the agreement that I created?

22   A.  Yes.

23   Q.  And did you find a signed document that's very difficult

24   to see -- or it's not a good copy -- where Mr. Wright typed

25   and signed an agreement that said "This agreement is for the

1    transfer of stock from Songstergram Inc.; the company.  This

2    stock transfer will occur in three tranches in the amount of

3    $83,333.33 each.  The company will transfer shares for each

4    tranche in the amount of 6.17 percent."  Correct?

5    A.  To Rick Maike, not to i2G.

6    Q.  Oh, yeah.  To Rick Maike up here.  Then it says, "A long

7    form stock purchase agreement will follow this agreement,"

8    correct?

9    A.  Yes.

10   Q.  And then in your packet was a stock purchase agreement

11   that indicates that Infinity 2 Global Hong Kong Limited and

12   Rocky Wright had an agreement where $250,000 would be paid in

13   exchange for 20 percent of the company, correct?

14   A.  Yes.

15   Q.  And that was dated 11-30-2013 and 12-2-2013?

16   A.  Yes.

17   Q.  And the money -- there was actually that amount of money

18   that went to Rocky Wright, correct?

19   A.  Yes.

20   Q.  And then Rocky Wright at some point took the position that

21   he had not sold ownership interest in the company and said he

22   was going to return the money, correct?

23   A.  I know he had some disagreements about -- with the

24   company.  And as to what he sent back, I don't know.  I don't

25   remember him ever sending any money back.

1    Q.  He did not send any money back, but --

2    A.  Okay.

3    Q.  -- did he -- isn't it true that in December 2014 he

4    indicated that Maike and Wright are trying to come to a

5    settlement?

6    A.  Oh, okay.  That sounds right, yeah.

7    Q.  And Wright has agreed to return all money received by

8    Maike?

9    A.  Who's saying that?

10   Q.  Mr. Wright was telling you that he had agreed to return

11   all money he --

12   A.  He may have said that, yes.

13   Q.  Okay.  And by the way, during your investigation, did you

14   become familiar with Mr. Wright's reputation for honesty?

15   A.  I could only -- I hate to speculate on --

16   Q.  You don't know?

17   A.  I don't know how honest he was, no.

18   Q.  And then Mr. Wright signed another agreement where he sold

19   5.5 percent of Qubeey stock to Mr. Maike for $60,000, correct?

20   A.  That sounds right, yes.

21   Q.  And you saw emails about the Songstergram relationship,

22   didn't you, that were seized from Mr. Maike's computer?

23   A.  Yes.

24   Q.  Can we agree that the emails between Rocky Wright and Rick

25   Maike reflected that i2G had permission to promote

1    Songstergram to other people for money?

2    A.   I'd have to -- I hate to do this, but -- the agreement --

3    but I know they wanted people to download the Songstergram

4    program, so that would -- I guess if that's what you're asking

5    me, the answer would be yes.

6    Q.   Well, no.  It's a little different because of what

7    happened afterwards.  I want to know whether we can agree that

8    the emails reflect that i2G had permission to promote

9    Songstergram to other people for money.

10   A.   Promote Songstergram to other people for money?

11   Q.   Right.  I mean, did you see the video of Rocky Wright

12   giving the presentation in March at the i2G convention?

13   A.   No.  I haven't seen the video of Rocky Wright, no.

14   Q.   Okay.  Do you know whether or not anything you've seen,

15   the emails that you've seen, show that Rocky Wright was in

16   agreement with i2G promoting through its network to other

17   people the use of Songstergram?  And if that happened, the i2G

18   participants would get money for that?

19   A.   Yeah.  And I never really understood how that was going to

20   happen because that part was never explained.  You would get

21   money, but there was no explanation on how, so -- I do

22   remember people talking about that, yeah.

23   Q.   Well, again, what I'm really getting at is do you remember

24   Rocky agreeing to that?

25   A.   Yeah.  I don't.

1    Q.  Okay.  Then let me show you a document --

2                MR. MEYER:  Your Honor, could we be heard for one

3    moment?

4                THE COURT:  Yes, sir.

5                (Bench conference on the record.)

6                THE COURT:  Yes, sir?

7                MR. MEYER:  This is really my last topic, but in

8    light of the witness that Mr. Wisenberg alluded to earlier and

9    his flight, I mean, I would -- unless we go late tonight, it's

10   going to be hard to get him on and I'm just fearful --

11               THE COURT:  You know what, why don't you finish up?

12   All right.  Time's a wasting.  Thank you.

13               (End of bench conference.)

14   BY MR. MEYER:

15   Q.  I'm going to show you a document that's -- I'm going to

16   mark as Exhibit 49.  This is Yahoo 7289.  I'll put it up just

17   for you while it's making its way to you.  Is this one of the

18   Yahoo emails for Rocky Wright to Rick Maike -- well, it's a

19   forward, but underlying email is Rocky Wright to Rick Maike,

20   September 19, 2013?

21   A.  Yes.

22               MR. MEYER:  Okay.  I'd move to introduce this as

23   Barnes 50 -- I'm sorry -- Barnes 49.

24               MS. FORD:  No objection.

25               THE COURT:  All right.  You said no objection?

1              MS. FORD:  No objection.

2              THE COURT:  All right.  Very well.  It will be

3    admitted.

4              (Barnes Exhibit 49 admitted in evidence.)

5    BY MR. MEYERS:

6    Q.  This is an email from Rocky Wright to Rick Maike, Thursday

7    September 19, 2013, and they're talking about various business

8    discussions they're having and Rocky is asking Mr. Maike for

9    money, correct?

10   A.  Yes.

11   Q.  And what he's saying that Mr. Maike is going to get in

12   exchange is i2G will have the ability to sell Songstergram for

13   50 cents per person per month, correct?

14   A.  Yes.

15   Q.  Okay.  And I'm going to show you another document that I'm

16   going to mark as Exhibit 50.  Is this an email -- email

17   exchange in October of 2013 between Mr. Maike and Mr. Wright?

18   A.  Yes.

19              MR. MEYER:  I move to introduce this as Exhibit 50;

20   Barnes Exhibit 50.

21              THE COURT:  All right.  It will be admitted.

22              MS. FORD:  No objection.

23              (Barnes Exhibit 50 admitted in evidence.)

24   BY MR. MEYER:

25   Q.  And this is -- if we could publish that to the jury.  This

1    is kind of classic Rocky Wright material, isn't it?

2    A.   I don't know what you mean by that.

3    Q.   Let's take a look at it.  "Hey, Rick.  Hope things are

4    going superbly in Hong Kong.  I had two amazing meetings with

5    Jimmy Levine [sic]."  Do you know who Jimmy Levine is?

6    A.   Jimmy Ivene?

7    Q.   Ivene?

8    A.   Yes.

9    Q.   Got a link.  "And I'm meeting with Ron Burkle and his CFO

10   Richard Dabo next week.  In case you don't know these guys,

11   check out this link" -- from Forbes.  "Additionally, we had

12   two amazing meetings with a guy named Jack Kahan to license

13   Songstergram in South America and Mexico.  I also got an email

14   from my Jordan guy which I'll forward you; however, I can't

15   wait that long.  I have bills I need to take care of urgently,

16   so can we jump on the phone today or Skype to talk through our

17   Songstergram deal."  Correct?

18   A.   Yes, that's what it says.

19   Q.   Did you see other emails where Rocky Wright was kind of

20   talking about all his big deals on the horizon?

21   A.   I can't recall any.  I know that's not -- that there

22   aren't any.  I just don't remember.

23   Q.   And then I'm going to show you Exhibit 51; Barnes Exhibit

24   51.  If you'll take a look at that while it's being passed

25   out.  This is Yahoo 15351.  Is this another email exchange in

1    the Yahoo email accounts between Rocky and Rick Maike?

2              MS. FORD:  Judge, may we be heard briefly, please?

3              THE COURT:  Yes.

4              (Bench conference on the record.)

5              THE COURT:  Yes, ma'am?

6              MS. FORD:  Judge, I didn't object to the first

7    couple of these emails because, you know, they went to

8    questions about -- for example, the very first one and then

9    Mr. Meyer offered -- documented some of the negotiations

10   between Rick Maike and Mr. Wright about -- about Songstergram

11   and whether they were going to be able to market or not.

12             I don't know how many of these Mr. Meyer intends to

13   introduce, but these are all hearsay of Rocky Wright that he

14   is attempting to introduce to paint a picture of Rocky Wright

15   for the jury when apparently Mr. Wright is not going to be

16   called as a witness, and so --

17             THE COURT:  All right.  Mr. Barnes -- I mean,

18   Mr. Meyer?

19             MR. MEYER:  Yeah.

20             THE COURT:  Is this being offered for the truth of

21   the matter asserted?

22             MR. MEYER:  No.  We don't believe anything Rocky

23   Wright says.

24             THE COURT:  It's all a bunch of lies, right?

25             MR. MEYER:  Correct.

1                    THE COURT:  Okay.  Objection overruled.

2                    (End of bench conference.)

3     BY MR. MEYERS:

4     Q.  So the document you have in front of you, is it marked 51?

5     A.  It's not marked.

6     Q.  Oh, it isn't?

7     A.  No.

8                    THE COURT:  Well, here.  Take this one.  51?

9                    MR. MEYER:  Yeah.  I would move to introduce Exhibit

10    51.

11                   THE COURT:  All right.  It will be admitted.

12                   (Barnes Exhibit 51 admitted in evidence.)

13    BY MR. MEYER:

14    Q.  So here's another email.  This is from November from Rocky

15    to Rick Maike.  Again, you know, "Everything is about to

16    change" -- "I apologize that things have been slow on the

17    build-out on the Qubeey side.  Everything is about to change,

18    however as Scott and his team are flying in tomorrow to

19    complete this deal.  They are meeting with the doc and Jeff

20    and myself on Thursday and then with myself and the bankruptcy

21    attorney by Friday to put the plan together to give to the

22    courts.  Then we are flush with the money to get everything

23    cranking full steam ahead.  I can't apologize enough that all

24    of this has happened at the worst -- in the worst of timing."

25                   "So on the Songstergram side of things, things are

1    cranking like crazy.  So many major things going on.  Are you

2    able to send the document over for that as I really need to

3    close the investment that we spoke about urgently?  We had a

4    remarkable meeting with the company in China who is ready to

5    move forward," blah, blah, blah.  Correct?

6    A.   Yes.

7    Q.   And then as we get closer to this event in -- do you

8    remember during your investigation being aware of an event in

9    March of 2014 where Songstergram was introduced to the i2G

10   Touch?

11   A.   Yeah.  That was when -- I do remember the first time it

12   was mentioned or introduced was well into 2014 which was

13   significant to me because up to that point the company had

14   already taken in tens of millions of dollars.  So the

15   Songstergram part of things was definitely a bookend toward

16   the end --

17   Q.   Okay.

18   A.   -- so that was the time --

19   Q.   Does that mean it wasn't a significant aspect of your

20   investigation or it was?

21   A.   It was but I think -- yes, it still was.

22   Q.   Okay.  So 'cause we -- I want to show you a document I'm

23   going to mark as Exhibit 52.  And this is Yahoo 22047.  Is

24   this an email from Rocky Wright to Rick Maike of February 9,

25   2014, in the month leading up to that event?

1    A.  Yes.

2    Q.  And he attaches two document --

3              MR. MEYER:  I move to introduce this as Exhibit --

4    Barnes Exhibit 52.

5              THE COURT:  All right.  It will be admitted.

6              (Barnes Exhibit 52 admitted in evidence.)

7    BY MR. MEYER:

8    Q.  So this is in February of 2014 Rocky Wright sending Rick

9    Maike documents.  "I've attached two documents.  One is what

10   is needed for the launch to be flawless.  The second is trying

11   to come up with a revenue sharing plan with i2G."  And he

12   says, "How many users can i2G generate versus" --

13   considerations for a revenue sharing agreement.  "How many

14   users can i2G generate versus the SG celbs," etcetera,

15   correct?

16   A.  Yes.

17   Q.  "How quickly can i2G generate users?  What will the i2G

18   model be to assure rapid user acquisition," etcetera.

19   Correct?

20   A.  Yes.

21   Q.  And when you -- did you ever hear Rocky Wright talking

22   about celebrities that had been involved with his various

23   businesses?

24   A.  Most of the celebrity talk I honestly heard from, like,

25   Faraday's Google Hangouts.  When I talked to Mr. Wright about

1    celebrities he had when we finally met in person, he mentioned

2    one.  I can't remember who it was.

3    Q.  Chris Brown?

4    A.  Yes, Chris Brown.

5    Q.  He told you about Chris Brown?

6    A.  He said he knew Chris Brown or had some contact with him,

7    but it was clear he did not have, you know, some of the other

8    people like Britney Spears or whatever had been presented

9    before by the company.

10   Q.  And then he indicated to Rick Maike in February 2014 that

11   Songstergram had all of the top hits from the past five

12   decades of music, correct?

13   A.  Say that -- I'm sorry.  Say that one more time.

14   Q.  Rocky Wright communicated to Rick Maike on February 14,

15   2014, that Songstergram had all of the top hits from the past

16   five decades of music?

17   A.  Is that on an email or is that --

18   Q.  Yeah.  Does this refresh your recollection?

19   A.  "These songs are the top hits from" -- yes, he says that.

20   Q.  Okay.  And then he speaks on March 1st and then a month

21   later the cease and desist letters start coming, correct?

22   A.  Yes.

23   Q.  And you would agree that in the cease and desist letter

24   from the law offices of Daniel King, it indicates that, "In

25   light of what has happened, my client has instructed

1    Mr. Wright to take appropriate steps to immediately return the

2    monies which had previously been tendered by i2G over to

3    Mr. Wright in anticipation of the non-consummated agreement,"

4    correct?

5    A.   Okay.   Yes.

6    Q.   So in other words, all of the sudden after these

7    communications, after Rocky Wright appears at the event, after

8    he talks to all the IBOs that were at that event, somebody --

9    some lawyer sends a letter and says my client, Songstergram,

10   is instructing Rocky Wright to give all the money back that he

11   gave you?

12   A.   Yes.   I think the heart of that was the representations

13   that were being made that Britney Spears and all these big

14   Hollywood celebrities were part of Songstergram and that was

15   horrifying Rocky Wright 'cause they weren't.

16   Q.   Oh, really?   Did you ever hear or see the video where

17   Rocky Wright told the i2G people that that the jury has seen?

18   A.   I haven't seen that, no.

19   Q.   So is that what Rocky told you; he was horrified by the

20   fact that i2G had the audacity to be telling people that

21   Britney Spears endorsed his product?   Did he tell you that?

22   A.   He didn't use "horrified" but he said he did not have her

23   signed up as a person.

24   Q.   Right.   So what happened was somebody other than Rocky

25   Wright was in the background at Songstergram, correct?

1    A.   Somebody other than Rocky Wright was in the background at

2    Songstergram?

3    Q.   Yeah.   Some other owner was involved telling a lawyer to

4    send something out for Songstergram and saying "I'm going to

5    have my client tell Rocky to send the money back"?

6    A.   I don't -- I don't have the document --

7    Q.   You don't know?

8    A.   I don't understand your question, I guess.

9    Q.   Okay.

10   A.   You're referring to an email that I'm not looking at, so I

11   don't know.

12   Q.   Can you agree that Rick Maike was very surprised when he

13   got and learned that there were cease and desist letters?

14   A.   Rick Maike had been talking with Rocky Wright since

15   September 2013.   I would think in six months time, if he had

16   an agreement with Britney Spears, he would have met her or

17   would have asked those questions.   So was he surprised?   I

18   would think he would have done some due diligence to make sure

19   this stuff was on the up-and-up which he apparently did not.

20   Q.   So you don't think he was surprised?

21   A.   I don't know.

22   Q.   Did you read the emails about how they immediately reacted

23   when this surfaced?

24   A.   The cease and desist?

25   Q.   Yeah.

1    A.  I'm sure if they're in there, I probably have, but --

2    again, to give some context --

3    Q.  I don't want context, sir.  We have to move it.  I'm just

4    asking whether or not -- you know whether or not there was a

5    reaction when they got the cease and desist letters.

6    A.  I'm sure anybody that gets a cease and desist order is

7    unhappy.

8    Q.  And I'm going to show you what I'm going to mark as

9    Exhibit 53; Barnes Exhibit 53.  And this was Rick Maike's

10   reaction to the cease and desist letters, correct?

11   A.  Yes.

12              MR. MEYER:  I move to introduce this as Exhibit 53.

13              THE COURT:  All right.  Without objection it will be

14   admitted.

15              (Barnes Exhibit 53 admitted in evidence.)

16   BY MR. MEYER:

17   Q.  And what he writes is -- back to this Daniel King, this

18   lawyer for Songstergram.  He says, "You do not represent

19   Songstergram Inc.," right?

20   A.  Yes.

21   Q.  And he says, "I happened to be on the phone with Rocky

22   Wright when this email came in and he has no idea that you

23   were sending anything," correct?

24   A.  Yes.

25   Q.  And then Mr. Maike gets his lawyer involved.  You see Dave

1    Koerner copied here?

2    A.   Yes.

3    Q.   And then they hire a California law firm to get involved

4    in the issue, correct?

5              MS. FORD:   Judge, I'm --

6    Q.   If you know?

7    A.   Yeah.   I don't know any of the details of the lawsuit or

8    cease and desist, so I can't answer that -- or I don't know, I

9    guess, is the answer.

10   Q.   Do you know whether or not lawyers got involved over the

11   issue?

12   A.   Yes, they did.

13   Q.   And then fast forward to December of that year, Rocky

14   tells you he's going to send the money back to Rick, correct,

15   and he's trying to work something out?

16   A.   If there's emails that say that, then yes.

17   Q.   Your report says that.

18   A.   Okay.   Yes.   Then, I mean, by December of 2014, is that

19   what you're talking about?

20   Q.   Yes, sir.

21   A.   Okay.   Songstergram had -- the agreement was over and so

22   they were negotiating how to resolve that dispute.

23   Q.   And then did you see whether or not Rocky Wright at the

24   end of 2014 sold the Songstergram assets and the Qubeey assets

25   to another company?

1    A.   I'm not familiar with that.

2              MS. FORD:  Objection, Your Honor.

3              THE COURT:  All right.

4              MS. FORD:  Relevance.

5              MR. MEYER:  He didn't know, so I'm not going to ask

6    him anything else.

7              THE COURT:  All right.  Sustained.

8    BY MR. MEYER:

9    Q.   Sir, would you agree that when people joined i2G -- when

10   people joined i2G were required to get a unique code for

11   people who wanted to use the i2G casino?

12   A.   Yes.  I assume you needed some kind of login to get into

13   the casino.

14   Q.   Right.  In other words, if you were overseas and you used

15   the casino, you needed a code so that that would be associated

16   with one of the members?

17   A.   Yeah.  I had a hard time getting people that were

18   overseas, to contact those people and interview them, so I

19   didn't really talk to -- I can't think of anyone or very few

20   'cause I had that question:  How do you get on this casino?

21   How do you use it?  Because in the United States you could not

22   use it, but certainly you would have to enter some kind of

23   code to get on it.

24   Q.   Let me show you a document.  And is this --

25              THE COURT:  Mr. Meyer, the jury's going to need to

1    take a break.

2            MR. MEYER:  I got literally two -- this and one

3    other question and I'm done.

4            THE COURT:  All right.  I'll hold you to that.

5            MR. MEYER:  Maybe four.

6    BY MR. MEYER:

7    Q.  Is this a report you wrote?

8    A.  Yes.

9    Q.  And did you write, "People who joined i2G were required to

10   get a unique code for each person which allowed them to gamble

11   on the site"?

12   A.  Yeah.  This is from Wayne if I'm not mistaken -- Wayne

13   Fisher.  He worked at Plus-Five for a brief time.  He was very

14   helpful.  He was one person who worked there I talked to.  So

15   you're right; he did say you had to have a code to get on.

16   Q.  And then there's a person named Jordan Adams and he was in

17   North Carolina on occasion and he was there before the casino

18   started, correct?

19   A.  Well, he was one of their initial investors -- of the

20   people -- there was a slew of people in North Carolina that

21   came in, so when the casino started, I would have to answer

22   that.

23   Q.  I mean, that's really my only question so we can -- do you

24   agree he was in North Carolina before the casino started?

25   A.  Yes.

1    Q.  And when he was in North Carolina, he was with Doyce and

2    Stephen Barnes?

3    A.  He was at their house?

4    Q.  He was with them.  He was at -- he met Doyce and Stephen

5    Barnes?

6    A.  Yes.

7    Q.  Okay.  No further questions.

8              THE COURT:  All right.  We'll take a break.  We'll

9    try to start back -- we will start back at 3:45.  So stretch

10   your legs and we'll go probably till 5:00 o'clock, hopefully

11   not beyond, so -- yes, make haste.

12             COURT SECURITY OFFICER:  All rise for the jury.

13             (Jury out.)

14             THE COURT:  All right.  You-all may be seated and

15   you may step down, sir.  Mr. Manning, do you have an idea how

16   long it's going to take you?

17             MR. MANNING:  I was just going to talk to you about

18   that.  It's going to be a while.  I don't want to say it's

19   going to be a half hour and then take two or three hours, but

20   it's definitely going to be a long time.  I was just going to

21   say, I don't know if Mr. Wisenberg's client is going to be

22   able to get on today, I apologize, but there is a lot of

23   information --

24             THE COURT:  No need to apologize to me.  All right.

25   So, Mr. Wisenberg, are you suggesting we bring in your witness

1    now at 3:45 right in the middle of this one?

2              MR. WISENBERG:  You know, I didn't -- I was hoping

3    that -- I was hoping that we'd be done with the cross by then.

4    I don't want to interfere with Mr. Manning's cross and the

5    flow of things.  This is -- like I said, this is a witness who

6    I don't think would take more than half an hour.  You know,

7    he's not a lengthy witness and he can't get a flight out later

8    than 7:00 tomorrow morning.

9              THE COURT:  We'll just have to see what time we get

10   finished with this witness.  I'm not inclined to interrupt

11   this witness to bring in somebody and I'm, you know, sorry

12   about that.  Travel arrangements have been difficult for a

13   number of people for this case, so we'll see how long it

14   takes.

15             I mean, if we got finished at 4:30 and you had a

16   half an hour, then maybe -- and I'm not suggesting,

17   Mr. Manning, that you cut yourself short.  I'm just going to

18   let this play out.  Some things could have been done more

19   quickly, but time waits for no man or woman -- mankind, human

20   being, however it should be said, so --

21             MR. SEWELL:  And I have no idea how long the cross

22   will be for this witness.  I don't know -- for Mr. Wisenberg's

23   witness.  I mean, I just don't know.

24             THE COURT:  All right.  Well, I would try -- I still

25   am not foreclosing an attempt to get that done today, but it's

1    looking unlikely, frankly, so we'll do what we can do.  Be

2    back in a little bit.

3              (Recess at 3:33 p.m. until 3:47 p.m.)

4              THE COURT:  Bring Agent McClelland back in, please.

5              MR. MANNING:  Your Honor, just to save time, I'm not

6    going to admit this but this is grand jury material.  I'm

7    going to be going over parts of it.  Do you want a copy

8    because I'm not going to present this to the jury.

9              THE COURT:  That would be fine.  Yes, please.

10             COURT SECURITY OFFICER:  All rise for the jury.

11             (Jury in.)

12             THE COURT:  All right.  Mr. Manning, you may

13   proceed.

14                      CROSS-EXAMINATION

15   BY MR. MANNING:

16   Q.  Mr. McClelland, I just want to go over some testimony that

17   you've either done today or throughout this case.  I just --

18   you know, you know you're being asked the precise, accurate

19   testimony, correct, in trial?

20   A.  Yes.

21   Q.  Okay.  And we don't want to make assumptions or anything

22   like that.  We want to have it based on fact.

23   A.  Yes.

24   Q.  Okay.  The first thing I want to go over is the chart you

25   summarized.  I'm not trying to say you did anything wrong, but

1    I just want to go over it to see if you used this other chart

2    to base it on, okay?

3    A.  Okay.

4           MR. MANNING:  Give me one second.  This is only

5    going up for him, not the jury.

6    BY MR. MANNING:

7    Q.  This is a chart that was previously admitted on -- I don't

8    know if you've actually got to see it.

9           THE COURT:  What exhibit number, please?

10          MR. MANNING:  Exhibit number is 101I from the

11   federal government.

12   BY MR. MANNING:

13   Q.  Would you like me to move around in it, sir?

14   A.  Is this the Global Payroll commission --

15   Q.  I believe so.  It has everybody in it, I guess.  It says

16   how much everybody made for every position.

17   A.  Yes, I'm familiar with it.

18   Q.  Okay.  Did you use this chart for the basis of making your

19   summary chart?

20   A.  Which summary chart?

21   Q.  The summary chart that they showed you where it says how

22   many people made money or --

23   A.  Yeah.  Yes.

24          MR. SEWELL:  Your Honor, can we approach?

25          THE COURT:  Yes.

 1                    (Bench conference on the record.)

 2              THE COURT:  Yes.

 3              MR. SEWELL:  Just for -- for Mr. Manning.  This is

 4    not from Global Payroll.  This is from Jerry Reynolds.  This

 5    was obtained after Agent McClelland departed, so I think -- I

 6    just want you to know I believe he's mistaken that he's seen

 7    this before because this was obtained by the United States

 8    after and I think -- and it's not from Global Payroll.  This

 9    is from Jerry Reynolds and the United States got this after he

10    left the FBI.

11              MR. MANNING:  Okay.

12              MR. MEYER:  So he did use this to make the summary

13    chart that talked about how much people made?

14              MR. SEWELL:  He made his summary charts before he

15    left, right?  So he made his summary charts before he left the

16    FBI.  He has done no work since he --

17              MS. FORD:  Retired.

18              MR. SEWELL:  That's why Matt has the new summary

19    chart.

20              THE COURT:  Do you want to get up and testify?

21    Maybe he can just ask you the questions.  I'm sorry.  I think

22    we have to do this through the witness.  So if he's wrong,

23    you're going to have to handle it on redirect or we can have

24    the jury leave and we can try to sort this out.

25              MR. SEWELL:  I mean, the objection is I know that

1    he's not seen this document before and I think -- but he's

2    seen a lot of spreadsheets and this is not -- this is from

3    Jerry Reynolds --

4              THE COURT:  That's not what he said.

5              MR. SEWELL:  But he didn't get a chance to review

6    the spreadsheet.

7              THE COURT:  Objection overruled.

8              (End of bench conference.)

9    BY MR. MANNING:

10   Q.  I apologize, Mr. McClelland.  Do we still call you Special

11   Agent McClelland or just Mr. McClelland?

12   A.  Some people call me "special" but not out of respect, but

13   you can just call me --

14   Q.  Okay.

15   A.  -- Mr. McClelland is fine.

16   Q.  Okay.  Mr. McClelland, what it is is -- I was just

17   informed -- actually, this isn't a chart you've seen before,

18   okay?  This was prepared after you came in, but it's based on

19   the same type of information.  And this is maybe where we're

20   running into an issue with the chart that you made up and what

21   this information is, but I want to address it for the jury and

22   for you so you can see what I'm talking about, okay, and maybe

23   you can tell us where the differences are.

24   A.  Okay.

25   Q.  Okay.  The chart that you presented -- the earlier chart

1    showed a big graph where hardly anybody really made money -- a

2    lot of people lost money; is that correct?

3    A.   Yes.  It was the Emperors.

4    Q.   The Emperors.  All I want to do is concentrate on the

5    Emperors to make this easier, okay?

6    A.   Okay.

7    Q.   Now, I want to quickly ask you if you've seen this.

8            MR. MANNING:  Can you put this on the ELMO just for

9    him?

10   Q.   Okay.  This is a chart that was made -- I don't know if it

11   was before you left or not.  It was -- it's U.S. 7020.  It's

12   the top 25 earners that were -- that Mr. Reynolds put out, I

13   think.

14   A.   Right.  So Mr. Reynolds has a back office database that

15   had certain numbers in it that displayed commissions.  I went

16   with the actual dollars that went out.  So Mr. Reynolds

17   numbers sometimes would sync with what really happened and

18   sometimes he would show amounts as high as 30 or 40 million

19   dollars in some cases that may or may not have happened, but

20   if you're asking if I -- you're getting ready to ask, I guess,

21   was this used in my summary chart, it was not.

22           And the reason was I went and used the bank records

23   and the Global Payroll records which were actual dollars that

24   went out, not what the back office system said went out.  Two

25   different things.  I wanted to make sure if I said something

1    went out, it actually went out from a bank.  And there were

2    instances that I saw that Mr. Reynolds records didn't

3    correspond to what the bank records show.  For example, it

4    shows Jason Syn was paid $3 million and I couldn't find $3

5    million coming out of the bank account.

6    Q.  I understand.  That's not one of the persons I want to

7    use.  But there is people on here that I was going to use

8    because it just makes it easier by choosing that they did

9    Emperor spots -- that they bought Emperor spots off one chart,

10   it shows where they bought them, it shows how much money they

11   made, and then it shows a chart of just a few people.

12   A.  Okay.  I'm just pointing out here that the amounts here of

13   commissions paid, I did not rely on those numbers because I

14   didn't think they were as reliable as the bank records.

15   Q.  Okay.  But would you state that if somebody bought an

16   Emperor spot and they -- the objective of your chart is saying

17   they bought an Emperor spot and they did not make money with

18   the Emperor spot?

19   A.  They didn't make more than $5,000.

20   Q.  Okay.  That's the point I'm trying to make.

21   A.  Okay.

22   Q.  So let's go back to -- actually, while we have it up, on

23   here do you see the second line?  It says Christina.

24   A.  Christina, yes.

25   Q.  Okay.  I just happened to look her record up, so it's just

1    one I want to use.  If you want, you can go with anything

2    else.  It doesn't really matter to me, okay?  But what I want

3    to do now is bring up this other chart on here to show you.

4    A.  Okay.

5    Q.  Okay.  And I have this chart set up so that it's -- guess

6    I have to learn my alphabet real quick.  I picked this one

7    because it has a lot, but it doesn't -- it shows the type of

8    things I'm talking about.  Okay.  What it is is I'm going to

9    start here at the top of the Emperor spots and I'm going to go

10   to here.  Well, actually, I'll just do the Emperor spots

11   because you said you based it off Emperor spots, correct?

12   A.  Yes.

13   Q.  Okay.  Here it shows that she has multiple spots -- I

14   think it's 19.  Is that correct?

15   A.  Yes.

16   Q.  Okay.  And then if we go over to the other side, most of

17   them show she made -- she didn't make money, correct?  That's

18   column Q.

19   A.  Yeah.  I don't know what that column is.

20   Q.  Okay.  I'll bring it up to the top so we can see that.

21   Okay.  Well, it actually doesn't tell us, but -- I thought it

22   had a heading on the top.  Okay.  I guess it's not going to be

23   as easy to show.  But technically what it is is we see she

24   doesn't really make any money.  It says this is how much money

25   she paid for her spot, this is how much money she put in and

1    then this is how much money she made in the last column; each

2    person.  And so we'll just pick this person here, CTI, the

3    third one down.  He paid in 16 -- 619.95.  Do you know if that

4    would be for that price?

5    A.   One of the lower positions like high roller or

6    something --

7    Q.   Right, high roller.  Okay.  And then next to it it says

8    how much money -- I guess, "How much money may?"  That doesn't

9    make sense.  But over here it says 600 -- how much he should

10   have made, I guess, but here it says negative 619, okay?

11          Now, if I pick like, say -- let me pick an Emperor

12   that actually made some money, so -- here's a spot where you

13   can see how much he put in, how much his spot cost, and then

14   how much he made and then what's the difference of actually --

15   after he paid for the spot -- let me take away that arrow

16   again -- how much the person made after paying for their spot.

17   A.   Okay.

18   Q.   Okay?  Now, with Christine that I showed you, we seen

19   there was a lot of negatives.  Would you like me to bring that

20   back up?

21   A.   No.  I saw it.

22   Q.   Now, when we come over here to the ELMO to this one

23   here -- actually, I'm just going to admit this, but I guess it

24   doesn't matter.  This chart -- he can't identify it.  Never

25   mind.  I can't bring it up to the -- you have never seen this

 1    chart before, correct, this top 25?

 2    A.   I think I've seen it before.  It looks like something that

 3    Jerry Reynolds had provided.

 4    Q.   Okay.  It is something that Mr. Reynolds made.

 5              MR. MANNING:  Your Honor, can I admit this to make

 6    this easier as Hosseinipour 64?

 7              THE COURT:  Admit what?

 8              MR. MANNING:  Excuse me?

 9              THE COURT:  What are you seeking to admit?

10              MR. MANNING:  Admitting this chart; U.S. -- I'm

11    sorry -- U.S. 7020.  I want -- government's information I

12    wanted to admit as Hosseinipour 64.

13              MR. SEWELL:  Your Honor, can we approach?

14              THE COURT:  Yes.

15              (Bench conference on the record.)

16              MR. SEWELL:  So this was produced by Jerry Reynolds.

17    Jerry Reynolds is not here to authenticate it.  If Jerry

18    Reynolds was here, definitely, you know, we would have the

19    opportunity to cross, so there's -- there's issues with this

20    chart and that is why it was not used and we worked with Jerry

21    Reynolds to get more accurate information.

22              So the United States objects to this on the basis of

23    it's hearsay and specifically it's Jerry Reynolds' hearsay.

24    The fact that Dave -- you know, I think he says he may have

25    seen this before, I mean, it's --

1          THE COURT:  Mr. Manning?

2          MR. MANNING:  The objective here is that the chart

3    he showed -- the chart shows that most people had Emperor

4    spots did not make any money, but the data that he's looking

5    at from --

6          THE COURT:  Well, I know.  But this particular chart

7    was not created by him.  He didn't authenticate it.  It's

8    hearsay.  It's an out-of-court statement of, I guess, that

9    Mr. Reynolds created and I don't think you can introduce it

10   through this witness, so objection sustained.

11         (End of bench conference.)

12   BY MR. MANNING:

13   Q.  I apologize.  Okay.  We're going to move on.

14   A.  Okay.

15   Q.  I apologize for that.  What we were just talking about is

16   a very serious responsibility to present evidence to the grand

17   jury or to this jury that is based on fact, not opinion --

18   A.  Yes.

19   Q.  -- is that correct?

20   A.  Yes.

21   Q.  Okay.  And that's because people's -- well, technically

22   people's lives and livelihood depends on it; is that correct?

23   A.  Absolutely.

24   Q.  Okay.  Now, some of the evidence that you produced for the

25   grand jury that allowed my client and others to be indicted

1    seems to have issues.  I think the -- I can call them more

2    like misrepresentation and I just want to clarify it, okay?

3            You stated in your testimony before that

4    Ms. Hosseinipour held up a check in her own name at a company

5    event for 100 or $200,000.  Do you remember that?

6    A.  Yes.

7    Q.  Okay.  I have -- I've got an exhibit of that check that's

8    been previously admitted.  It's 164.  And I believe this is

9    the check you're talking about.  I'll just -- okay.  Is this

10   the check?

11   A.  Yes.

12   Q.  Okay.  Now, can you read who the check is made out to?

13           MR. SEWELL:  This has been admitted.  This one has

14   been admitted, so it can be shown to the jury.

15           MR. MANNING:  Oh, okay.  Can we show it to the jury?

16   Thank you.

17   BY MR. MANNING:

18   Q.  In this picture we have four individuals but the check is

19   made out to who?

20   A.  ProNetworking Incorporated.

21   Q.  Is this the check you were talking about?

22   A.  Yes.  That is her company.

23   Q.  But it's not made out to Ms. Hosseinipour?

24   A.  That's technically correct.  It's made out to

25   Ms. Hosseinipour's corporation.

 1    Q.  Right.  Now, we'll talk about that in a second, but it has

 2    four individuals there, correct?  And you know who the

 3    individuals are -- you've testified to them?

 4    A.  Yes.  There's -- there's six individuals, but the four

 5    holding the check, yes, I do know who they are.

 6    Q.  Okay.  Now, that check's made out to ProNetworking, not to

 7    Ms. Hosseinipour.  Do you think that is a fact that would be

 8    important to the grand jury to know; it was made out to a

 9    corporation instead of Ms. Hosseinipour?

10    A.  I would say no because if it's Ms. Hosseinipour's company

11    that she owns with her husband, then it's the same thing.

12    Q.  Okay.  In your investigation, did you look up

13    ProNetworking's Article of Incorporation?

14    A.  I think I did.

15    Q.  Okay.  Do you know whose name is on that as who owns it --

16    who's president?

17    A.  It was set up in Wyoming, so you couldn't see that.

18    Q.  No, no, no.  It's not made in Wyoming.  ProNetworking

19    Corporation.

20    A.  Oh.  I'd have to -- you'd have to refresh my recollection

21    on what record you have.  I don't remember.  That was years

22    ago.

23    Q.  Okay.  If I told you that ProNetworking was incorporated

24    in Florida and the president of the company was David Manning,

25    not Faraday, would you --

1    A.   That sounds right now that you -- my memory's coming back.

2    That is correct.

3    Q.   Okay.  And you stated that because -- that she's there,

4    part of ProNetworking, that this would be her money, correct?

5    A.   Yes.

6    Q.   Okay.  Then you stated that her and Mr. Anzalone who's

7    also president there actually would split the money; is that

8    correct?

9    A.   Yeah.  There were three corporations that were set up.

10   ProNetworking, Leaders R Us, and -- Leaders R Us,

11   ProNetworking --

12   Q.   Life Changers?

13   A.   -- Life Changers Production.  And it took a little bit of

14   work to figure out how this money got to them.  And I talked

15   to Jimmy and Larry who ran the Global Payroll System and he

16   provided me the routing numbers for all the banks that got

17   money credited to those three corporations and they were

18   equally split between bank accounts owned by the Anzalones and

19   Faraday and her husband.  So any money that went to any of

20   those three corporations went 50 percent to those two married

21   couples.

22   Q.   Okay.

23   A.   So getting back to your question -- I guess, original

24   question on would it be better to have her name on there or to

25   say it went directly to her.  It would have been more accurate

 1    to explain all of that, so I don't know that it's a material

 2    difference, you know.

 3    Q.  We're going to get to that.  And that's what I want to say

 4    because we want to make sure we're accurate and we're basing

 5    it on fact.

 6    A.  Right.

 7    Q.  Okay.  Now, we've made a couple different statements in

 8    that that we need to clarify too, but you stated that you

 9    found out Ms. Hosseinipour was part of this corporation

10    through GPG records; is that correct?

11    A.  Yes.

12    Q.  And GPG records, was it in her name?  Was the records in

13    GPG with her name on them?

14    A.  Interestingly, none of -- these four people were the only

15    people in the whole company that got commissions paid to --

16    well, that's not true.  There were other people that had

17    corporate names.  Most people got paid in their personal

18    names, so in this case they had corporations that had been set

19    up to be paid through.

20    Q.  All right.  Now, the ProNetworking GPG account, do you

21    know who created that account?  There's a signer for each one

22    that starts up the account.

23    A.  I don't know.

24    Q.  That was David Manning; the president of ProNetworking.

25    A.  Her husband?

1    Q.   Her husband.

2    A.   Okay.

3    Q.   Now, in the Life Changers, the sole person on that account

4    happens to be Susan Anzalone, correct?

5    A.   Okay.

6    Q.   Now, you've stated that Richard Anzalone and Faraday

7    Hosseinipour split these equally, correct, in your testimony?

8    A.   Yes.

9    Q.   Okay.  Now, how did you come to the conclusion that they

10   split it equally first?  Was there a contract?

11   A.   Like I said, I talked to the Global Payroll people and

12   then I subpoenaed the bank records for Ms. Hosseinipour and

13   saw the money going into joint bank account.

14   Q.   Joint bank account or was it to ProNetworking?

15   A.   I believe they were both signers on the account.

16   Q.   To which one?

17   A.   Wherever the money went to -- I can't remember the exact

18   name on the account statements, but my recollection is that

19   the bank account that the money landed in Ms. Hosseinipour and

20   Mr. Manning were both signers on that account.

21   Q.   Okay.  Now, you interviewed a guy named Gary -- I think

22   his name -- hold on.  Let me look.  One second.  Okay.  I just

23   got this from one of the other people because I didn't

24   actually have it.

25   A.   One more interesting thing about that check while we have

1   it up --

2            THE COURT:  No, sir.  Listen, just answer questions,

3   please.

4            THE WITNESS:  Sorry.

5            THE COURT:  Thank you.

6            MR. MANNING:  One moment.  Hold on.  I'm having a

7   problem finding --

8            THE COURT:  Mr. Manning, we do not have all day.

9            MR. MANNING:  I understand, Your Honor.  It was --

10   you know what, I know why I'm not finding it.  Sorry about

11   that.

12   BY MR. MANNING:

13   Q.  You interviewed a Mr. Gary Jones.  I just --

14            MR. MANNING:  Can you show this just to the

15   defendant -- I'm sorry -- to the witness?  Okay.

16   Q.  Now, you recognize this as one of your --

17   A.  Yes.

18   Q.  Okay.  And on here I've highlighted a part.  Could you

19   read that part for me, please?

20   A.  Sure.  "In 2013 Manning's income jumped significantly.

21   Manning was working for a network marketing company called

22   Infinity 2 Global.  Manning made about $800,000 from i2G

23   during 2013 and 2014.  Jones could not offer an explanation as

24   to why Manning was displaying a check at an i2G convention

25   from over $150,000 from i2G in September when he had received

1    far less than this amount into his account at this time.

2              MR. MEYER:  Objection, Your Honor, with respect to

3    Doyce Barnes.  Hearsay.

4              THE COURT:  Sustained.

5    BY MR. MANNING:

6    Q.  Okay.  Based on that --

7              THE COURT:  Wait a second.  The jury is to disregard

8    the last question.  You may proceed.

9    BY MR. MANNING:

10   Q.  Okay.  Based on that statement that you made from the

11   interview with Mr. Jones, would you say that he's stating that

12   Ms. Hosseinipour is in charge of that money or Mr. Manning's

13   in charge of that money?  Did he mention Ms. Hosseinipour as

14   well, I should ask --

15             MS. FORD:  Judge, may we approach, please?  I have

16   an objection.

17             THE COURT:  Sustained.

18             MS. FORD:  Thank you.

19             THE COURT:  You may proceed.

20             MR. MANNING:  That objection was sustained to that?

21             THE COURT:  Yes.  The entire question, yes.

22             MR. MANNING:  Okay.  Let's move on.  Actually,

23   Judge, can we be heard real quick?

24             THE COURT:  Yes.

25             (Bench conference on the record.)

1          MR. MANNING:  Your Honor, I think it's important to

2     make this distinction between Ms. Hosseinipour and Mr. Manning

3     because of the fact that they're stating that Ms. Hosseinipour

4     is the one that did all of this, but when you're looking at

5     the evidence that should be shown, it shows that Mr. Manning

6     is the one who was in charge of all this.

7          THE COURT:  Well, you can't do it through this

8     statement because it's hearsay.

9          MR. MANNING:  That's --

10         THE COURT:  Okay?  So the hearsay rule is -- it's

11    part of the Federal Rules of Evidence.  And unless there's an

12    exception to that hearsay rule -- do you have an exception to

13    the hearsay rule that would allow you to introduce that

14    evidence?  One doesn't spring immediately to my mind.  It's

15    late in the afternoon and so --

16         MS. FORD:  Judge, may I make another point as well?

17         THE COURT:  Yes.

18         MS. FORD:  As best I understand this line of

19    questioning, I think Mr. Manning's theory is that

20    Ms. Hosseinipour's husband should have been charged in the

21    case.  And, again, that's not -- charging decisions whether

22    somebody else should have been charged, will be charged, isn't

23    relevant for the jury.  And I think all of this goes to his

24    pretrial selective prosecution argument which is not relevant

25    at trial.

```
 1                    THE COURT:  Okay.  Very well.  And that's sustained

 2      as well.  You need to move on, please.

 3                    (End of bench conference.)

 4      BY MR. MANNING:

 5      Q.  You stated that bank records were pulled were from

 6      ProNetworking; is that correct?

 7      A.  The -- the -- which bank records, the --

 8      Q.  The bank records where you were stating -- okay.  You

 9      stated that there was a check -- okay.  In your testimony you

10      state that there's a check for $150,000 written out to

11      Ms. Hosseinipour and that you checked her bank account?

12      A.  Right.  There is a cardboard check that was presented.  I

13      never said that was a real check that was deposited in the

14      account.

15      Q.  I understand.  You saw a cardboard check presented

16      September 13 --

17      A.  Right.

18      Q.  -- for 100 or $200,000 that was made out in her name and

19      that you went to her bank account and it stated that -- and

20      you saw that in her bank account there was only like $20,000.

21      It didn't reconcile the two?

22      A.  That's right.

23      Q.  Okay.  But the check was actually made out to

24      ProNetworking; is that correct?

25      A.  Yes.
```

1    Q.   And the bank account is actually ProNetworking bank

2    account; is that correct?

3    A.   That's correct.

4    Q.   Okay.  There was no records pulled for Ms. Faraday

5    Hosseinipour's personal bank account?

6    A.   The -- where the money was going from the company?

7    Q.   Right.

8    A.   I got the routing number for that account and subpoenaed

9    that account.

10   Q.   Gotcha.  Okay.  Now, we had -- have heard testimony from

11   GPG where he states that they're only allowed to pull so much

12   money out of their account.  Did he tell you -- did Mr. Jamie

13   tell you about this; that they have a limit on how much money

14   can come out of their accounts?

15   A.   In each transaction, yes.

16   Q.   Right.  Okay.  And you have to request higher amounts, but

17   the highest you can request is $10,000 to come out of your

18   account during the week?

19   A.   At one time, yes.

20   Q.   Okay.  So is it possible that that check that's for

21   ProNetworking, right, the funds weren't all transferred in a

22   time frame you're looking at the account to ProNetworking's

23   account and could have still been at GPG?

24   A.   That's possible, yes.

25   Q.   Okay.  Okay.  You also stated that -- in your testimony

1    that Mr. Anzalone and Ms. Faraday had an agreement to split

2    the profits; is that correct?

3    A.   I saw that from the bank records.  I never saw a written

4    agreement, but from what -- the way the money was flowing, I

5    concluded there was an agreement.

6    Q.   Right.  Half of it going to ProNetworking, half of it

7    going to Life Changers?

8    A.   And Leaders R Us, I guess, was the third corporation.  The

9    three were being split evenly.

10   Q.   You're correct.  It went into ProNetworking and half would

11   go to Leaders R Us and then half --

12   A.   Yes.

13   Q.   Okay.  It was split 50/50, you're saying, between the two?

14   A.   That's what the commission records showed.

15   Q.   Okay.  And we just looked at a record from Mr. Manning's

16   accountant that said he earned the money and it went into his

17   bank account is the one -- his -- his accountant is stating

18   that Mr. Manning made the money and that his account -- which

19   he'd be talking about ProNetworking -- didn't have the

20   $20,000 -- the alleged $20,000 --

21              MR. SEWELL:  Objection.

22              THE COURT:  Sustained.  Objection sustained.  You

23   can't ask about what the accountant said, sir.

24   BY MR. MANNING:

25   Q.   Isn't it true there's over 2,300 independent business

1    owners that were registered with i2G -- G1E?

2    A.  2,300?

3    Q.  23,000.

4    A.  23,000?  The Global pay record -- or the Jerry Reynolds

5    records showed 20,000 entries, yeah, over a period of time.

6    Q.  Okay.  So ProNetworking was one of these 23,000

7    independent business owners; is that correct?

8    A.  Yes.

9    Q.  And there's really no connection to Ms. Hosseinipour and

10   i2G owners other than her role as an independent business

11   owner through ProNetworking?

12   A.  You talking about ownership for the company you mean or --

13   Q.  Well, her name isn't mentioned anywhere in i2G except in

14   ProNetworking records; is that correct?

15   A.  Yes.

16   Q.  And Ms. Hosseinipour didn't have a GPG account,

17   ProNetworking did; is that correct?

18   A.  Well, she had it through the corporation, yes.

19   Q.  Okay.  Okay.  Now, I want to ask you this question as far

20   as -- you're saying it was split between Ms. Hosseinipour and

21   Mr. Anzalone, okay, 50/50.  ProNetworking -- all those records

22   show 800,000 -- you said 800,000 went to ProNetworking to

23   Mr. Anzalone and 800,000 went to Faraday Hosseinipour?

24   A.  Yes.

25   Q.  But we know there's at least four individuals that were --

1    that are in these corporations -- or that we're talking about;

2    husband and wife teams?

3    A.   Right.

4    Q.   Okay.  Is it fair to say that somebody that's married

5    doesn't automatically say that they earned -- people don't

6    always put their money together, that's what I should say.  So

7    in other words, you're stating that the money that was earned

8    had to be split by at least two people, Mr. Manning and

9    Ms. Hosseinipour; is that correct?

10   A.   Depends on your wife, but -- that's correct.  And I think

11   I was basing that on the fact that Ms. Hosseinipour did --

12   between the couple -- the married couple -- seemed to do 95

13   percent of the promotional work in terms of Google Hangouts,

14   so therefore it seemed accurate for me to say she earned the

15   money.

16   Q.   Okay.  When you inspected ProNetworking bank accounts, did

17   you see if Ms. Hosseinipour had ever written a check out of

18   that account?

19   A.   I don't recall.

20   Q.   Okay.  Did you ever see a salary pulled out of that

21   account for Ms. Hosseinipour?

22   A.   I know she received it.  I did a little bit of work of

23   where the money went but honestly don't -- I can't recall

24   today where it went.

25   Q.   I gotcha.  Now, because of that $800,000 that we say

1    Ms. Hosseinipour received, you're basing this on -- she's made

2    a lot of money in i2G; is that correct?

3    A.  Yes.

4    Q.  And this brought her under the peruse of somebody to

5    investigate?

6    A.  Yes.  My job is to gather the facts.  I gather the bank

7    records and she rose to the top and the U.S. Attorney's Office

8    decided who they wanted to charge.

9              MR. WISENBERG:  May we approach, Your Honor,

10   briefly?

11             THE COURT:  Yes.

12             (Bench conference on the record.)

13             THE COURT:  Yes, sir?

14             MR. WISENBERG:  I'm not trying to cramp or crimp

15   Mr. Manning's style.  I want to preserve an objection for the

16   record since I objected all day yesterday to the testimony of

17   this witness based upon the fact that he was acting as a

18   summary witness and including hearsay.  I just want to renew

19   it as a continuing objection for this testimony as well.

20             THE COURT:  All right.  To the last question asked?

21             MR. WISENBERG:  No, no.

22             THE COURT:  Everything that came before?

23             MR. WISENBERG:  Well, no.  Everything going forward.

24   I don't want to object each time, but to the extent that he

25   is -- that he -- the questions are giving him an opening to

1    testify as a summary witness, I just want to make an objection

2    going forward to that without objecting each time like I did

3    yesterday with the government.

4            MR. MEYER:  Well, I'm going to object each time

5    because I'm very fearful of that.  I mean, if he asks

6    questions and just let's him start, you know, going off, I'm

7    going to object.

8            THE COURT:  Say "objection" and if it's obvious I'll

9    say "sustained" or we'll have to have a conversation about it.

10   You do need to object.

11           MR. WISENBERG:  Okay.

12           THE COURT:  It's a little bit like herding cats

13   right now and I'm doing the best I can.

14           MR. SEWELL:  Can we again -- there's reference to a

15   charging decision and who makes that.  It's not relevant for

16   the jury's consideration.  That part should be stricken.

17           THE COURT:  Say the word "objection," okay?

18           MR. SEWELL:  I object to that representation.

19           THE COURT:  I'm not going to strike it.

20           (End of bench conference.)

21   BY MR. MANNING:

22   Q.  The point I'm trying to address here, Special Agent

23   McClelland, is that this is a corporation and has two

24   individuals that are in the corporation as far as we can

25   state.  If -- if they had split themselves and they made

1    instead of a husband and wife team had bought two spots

2    separately, would that change how you perceive how much money

3    they made?

4              MR. WISENBERG:  Objection.  Relevance.

5              THE COURT:  Sustained.  Asked and answered.  You

6    need to move on, sir.

7              MR. MANNING:  Okay.

8    BY MR. MANNING:

9    Q.  On starting your investigation you stated -- you testified

10   that you've sent either yourself or other FBI agents out to

11   see certain people.  Was one such agent sent out to

12   Ms. Hosseinipour's house?

13   A.  Yes.

14   Q.  Was she interviewed?

15   A.  I think they talked to Mr. Manning.  I don't think she was

16   available.  I can't remember exactly why they only interviewed

17   him, but they talked to Mr. Manning.

18   Q.  Right.  And she was not there present?

19   A.  I'm assuming so.

20   Q.  Okay.  Now, so has she ever been interviewed or asked any

21   questions throughout this whole investigation to your

22   knowledge?

23   A.  I haven't had the chance to, no.

24   Q.  Okay.  Now, have you ever notice -- during your

25   investigation, did you notice if Ms. Hosseinipour made any

1    extravagant purchases during this time?

2    A.  I can't tell of any extravagant purchases.  I do -- like I

3    said before, I remember looking at the bank records -- and I'm

4    going way back on memory, but seems like some of it -- I can't

5    remember.  I can't remember, so I -- the short answer is I

6    don't know.

7    Q.  I haven't got to see the statement from the FBI agent that

8    did, so I don't know what's included in it, but I'm sure you

9    got to read it, so I'm going to ask you questions on what --

10   did it tell you what kind of car she was driving; that she was

11   driving a '98 Mustang at the time?

12           MR. SEWELL:  Objection to hearsay.

13           THE COURT:  Sustained.

14   BY MR. MANNING:

15   Q.  You stated in your testimony to the grand jury that the

16   promoters for the company of i2G were specifically certain

17   individuals, namely, one of them was Ms. Hosseinipour; is that

18   correct?

19   A.  Yes.

20   Q.  Okay.  Isn't it true that all 23,000 people that are all

21   part of it that own -- are business owners would be promoters

22   for the company?

23   A.  No.  Many of the people -- in fact I would say most of the

24   Emperors did not promote it.  They were hoping to get casino

25   profits and not be part of a multilevel marketing company, so

1    I would say -- and then, you know, particularly the -- so

2    certainly none of them have been promoted or paid at that

3    level.  I mean, she was the top in terms of commissions

4    earned.

5    Q.   From being part of ProNetworking?

6    A.   Right.

7    Q.   Okay.  Now, as far as that spot in ProNetworking --

8    ProNetworking, you say she was in the top position at

9    ProNetworking.  Do you know where she -- ProNetworking sat

10   inside the tree?

11   A.   She was part of ProNetworking, Leaders R Us, and the third

12   corporation, which for some reason I can never remember, but

13   the three corporations all have a spot in the tree, if you

14   will.  So to get the accurate number of commissions, you'd

15   have to add those three up and divide them, which I did, by

16   two and it came out to $900,000 or so that went to

17   Mr. Anzalone and his wife and to Ms. Hosseinipour and her

18   husband.

19   Q.   But in your statements you're saying that early promoters

20   taught promoters in the company on what we were trying to

21   bring forth to justice; is that correct?

22   A.   What statement are you referring to; the grand jury

23   testimony?

24   Q.   The grand jury statement.  In your grand jury statement --

25   A.   Okay.  Yes, that's correct.

1    Q.  Okay.  Okay.  Now, there was other people that actually

2    were charged that are not here --

3              MS. FORD:  Objection.

4              THE COURT:  Sustained.

5    BY MR. MANNING:

6    Q.  You state that you've seen many videos.  You did 20

7    conference calls, correct?  You had 20 conference calls you

8    actually looked through?

9    A.  That I listened to, yes.

10   Q.  Okay.  Was Ms. Hosseinipour doing any of those conference

11   calls?

12   A.  The i2G conference calls?

13   Q.  Yes.

14   A.  Ms. Hosseinipour was not on the conference calls I can

15   remember, no.

16   Q.  You also stated that you watched multiple videos; is that

17   correct?

18   A.  Yes.

19   Q.  And Ms. Hosseinipour did multiple videos; is that correct?

20   A.  Yes.

21   Q.  Okay.  Did you watch videos that other people did or was

22   it only Ms. Hosseinipour's videos?

23   A.  Yes.  I watched other ones as well.

24   Q.  Okay.  Were those videos any different than the videos

25   Ms. Hosseinipour put out?

1          MR. MEYER:  Objection.  Relevance.

2          THE COURT:  Overruled.

3    A.  I would say Ms. Hosseinipour had a unique style and her --

4    her videos were different, if that's what you're asking.  They

5    weren't the same.  I don't know what you mean by --

6    Q.  They didn't present the same material?

7    A.  Oh, material?

8    Q.  Yes.

9    A.  People would talk about different things or emphasize

10   different things.  And like I said, most promoters weren't

11   holding up cardboard checks for hundreds of thousands of

12   dollars, so in that sense hers were different.  That's an

13   example.  So, you know, I'm not quite sure what differences

14   you're shooting for here.

15   Q.  Well, I'd like -- did you watch the video from Mr. Tony

16   Adame?

17   A.  I don't recall watching his video, no.

18   Q.  Okay.  Now, you're stating that in these videos she was

19   selling the i2G product; is that correct?

20   A.  She was selling Emperor positions.

21   Q.  Okay.  Okay.  And you -- the reason you're saying she

22   sent -- excuse me -- was selling Emperor positions is because

23   she mentioned them?

24   A.  It's because people bought them.

25   Q.  Okay.  But didn't she give equal time to all positions

1    within -- when she's made the presentation, did she say

2    "Please buy an Emperor position" or did she say "This is the

3    play" -- "Here's my positions that they offer; novice, player,

4    high roller," and then, "Oh, by the way, we have an Emperor

5    position too," right?

6    A.   There were times where the whole other levels were

7    presented, but -- I know one specific video she had -- to

8    answer your question -- with Jason Syn in it during Google

9    Chat, his comment was "I only sell Emperor positions" and that

10   was someone on her team --

11   Q.   I understand.  Mr. Syn is a whole different animal.

12   A.   Well, he was in her video in her Google Chat.  So you

13   asked about her videos.

14   Q.   His theory -- that's not what I'm asking.

15   A.   I'm sorry.

16   Q.   Now, did you ever watch any videos where she's talking

17   about the i2G product -- training on the i2G product --

18   Touch -- the i2G Touch?

19   A.   She would announce that there were training sessions that

20   were scheduled.  I never saw here offering any training.

21   Q.   So she never had, like, Ms. Anzalone come in and do

22   training?

23   A.   Oh, yeah.  She had other people do that, yes.  I thought

24   you meant did she do it, no.

25   Q.   Right.  So she was like the monitor over who was coming on

1    to a video?

2    A.  There were a few times where they offered training.

3    Q.  Okay.  Now, these videos we're talking about -- I'm trying

4    to think how I want to word this.  Let's go to a different

5    point.  Ms. Hosseinipour -- do you know when Ms. Hosseinipour

6    actually joined i2G?

7    A.  No.  I can't -- I couldn't tell you.  I mean, it was at

8    least by September 2013 based on that check, but I can't tell

9    you the exact day.

10   Q.  Okay.  And that's because she's holding the check with her

11   husband and the other people?

12   A.  Well, I mean, there's -- I could go back and look at the

13   corporate records when the corporations were set up.  And I

14   did do that.  I just dont have that in front of me.  I can't

15   tell you the exact day.

16   Q.  Okay.  Fair.  Now, did you know Ms. Hosseinipour had

17   joined a company named Leaf prior to coming to i2G?

18   A.  I did not.

19   Q.  Okay.  And that -- she was sponsored by Richard Anzalone

20   into that company.

21   A.  I didn't know that.

22   Q.  Okay.  And you did not know that Ms. Hosseinipour actually

23   stayed with that company until February 2014?

24   A.  No.

25   Q.  Okay.  Did you get to read the rules of when people sign

1    up for i2G stating that you can only be in one company -- one

2    multilevel marketing company at a time, otherwise, you can't

3    be in the company.  You have to get out.

4    A.   In other words, you can only have one IBO position.

5    Q.   Right.

6    A.   I did.  And that was confusing to me because people were

7    buying multiple positions.

8    Q.   Okay.  But they're in the same company.  This is -- this

9    clause states you can only present -- you can only sell or try

10   to present i2G products.  You can't go and present vitamins

11   from somebody else.

12   A.   I didn't understand it to mean that.  I understood it to

13   mean when you join i2G you were an IBOs, an independent

14   business owner, and you joined at a certain level.  You could

15   upgrade that level, but you could only have one level.  And

16   then you could -- that would be your one spot in the triangle.

17   And then the limit, as I understood it, was you only had one

18   position and that's kind of a standard rule for these type of

19   companies.

20   Q.   Okay.  But you said that you've seen people that had

21   multiple spots in the same tree?

22   A.   Yes.  They were buying lots of Emperor positions.

23   Q.   So wouldn't it seem that that clause that I'm talking

24   about would state that it's outside companies you can't be

25   part of and not having multiple spots within i2G?

1    A.   I wouldn't interpret it that way, but -- no.

2    Q.   Okay.  You also state in your testimony that

3    Ms. Hosseinipour knew Rick Maike prior to April 2013; is that

4    correct?

5    A.   Mr. Maike knew Ms. Hosseinipour before --

6    Q.   Right.  That they knew each other.

7    A.   -- April?  Yes, I think that's -- I believe that's true.

8    Q.   And this is based on -- April 2013.  Were there emails

9    between Ms. Hosseinipour --

10   A.   That's what I'm asking; when was this testimony?  Because

11   once I got some of the Yahoo emails I could start to build in

12   a history of -- so when did I say that, I guess, is what I'm

13   asking?

14   Q.   Okay.  But -- the question actually is:  How do you -- you

15   testified that Ms. Hosseinipour and Rick Maike knew each other

16   prior to joining i2G.

17   A.   Yeah.  When did I say that, I guess, is what I'm asking?

18   Q.   You stated it in your grand jury testimony for --

19   A.   Okay.  And how did I know that or what led me to that

20   conclusion?  If I did -- I don't know how I knew that or

21   how -- but it probably was talking to a witness who knew her

22   who said that they had been in a prior company together.

23   Q.   Could that have been Chuck King?

24   A.   It could have been.

25   Q.   Okay.  Did you know Chuck King had a vendetta against

1    Ms. Hosseinipour?

2    A.  I did not know that.

3    Q.  Okay.  So basically saying that they knew each other prior

4    to i2G would be an assumption that you made?

5    A.  No.  Now you refreshed my memory, I do believe Chuck King

6    is the one who told me that.

7    Q.  Okay.

8    A.  I don't know if other witnesses did too, but it is

9    relevant because it was -- I'm trying to understand the

10   company; who's running the company and how do they know each

11   other and who are the promotors that sort of joined in --

12          MR. WISENBERG:  Objection.  Nonresponsive.

13          THE COURT:  Sustained.

14   BY MR. MANNING:

15   Q.  Okay.  So based on Mr. King's testimony that they knew

16   each other, you made the assumption that they knew each other;

17   is that correct?

18   A.  Yes.

19   Q.  Okay.  There's somebody else's testimony says they belong

20   to something, then they do.  I realize not everybody tells you

21   the truth in talking to you.  Do you agree with that?

22   A.  Yes.

23   Q.  Okay.  Did you ever question Mr. King if he had an

24   underlying motive against Ms. Hosseinipour?

25   A.  I didn't ask that question, no.

1    Q.  Did you know Chuck King had a site called

2    i2Gfullrefund.com?

3    A.  Yes.

4    Q.  Did you ever get to go to that site?

5    A.  Yes.

6    Q.  Okay.  Did you see any of the videos that he had online?

7    A.  Yes.

8    Q.  Okay.  Based on those videos, did you assume they were

9    correct in what he was presenting or did you investigate to

10   see if they were correct?

11   A.  I investigated to see if they were correct.

12   Q.  Okay.  Okay.  Did you know that Mr. King wrote all of the

13   emails -- okay.  Let me back up.  You interviewed a woman

14   named Martha Hurta; is that correct?

15   A.  Yes.

16   Q.  Okay.  In that she states that she lost money in i2G,

17   correct?

18            MR. WISENBERG:  Objection.

19            THE COURT:  Sustained.  It's hearsay.  Please move

20   on.

21            MR. MANNING:  Okay.

22   BY MR. MANNING:

23   Q.  May I ask this:  Did Ms. Hurta give you an email for -- to

24   attach to her statement -- that you attached to your

25   statement, I should say, do you remember?

1    A.   Vaguely.  I think she did.

2    Q.   Did you know Chuck King wrote that email?

3    A.   I'd have to see the email.  I didn't know -- Chuck -- hard

4    for me to answer because I don't see what you're talking

5    about, so -- I know Chuck King did talk to people and provide,

6    as was mentioned, sort of templates to write letters and

7    things of that nature, so if that's what you're referring to,

8    that's possible.  I don't know.

9    Q.   The reason I'm asking this is because on his website he

10   states in one of his videos that he writes all the emails for

11   her.  Did you ever get to watch that video?

12   A.   Yeah.  I was unaware he was logging into her email account

13   and sending emails.  That would be news.  I didn't know that

14   if that's true.

15   Q.   If that was true, that would make a difference, correct?

16   A.   Yeah.  But like you said, I did talk to her and she gave

17   me her own version of what happened.

18   Q.   Right.  And she came from a referral from Chuck King?

19   A.   I think -- I don't know.  I don't know -- I mean, I do

20   believe Chuck King had talked to her, but I believe I found

21   her checks as well on my own.

22   Q.   Did you ever do a basic background check on Chuck King

23   just to see who he was?

24   A.   A background check?

25   Q.   Yeah.  As far as, you know, he notified -- he contacts

1    you -- when somebody contacts you, sometimes you do background

2    checks to find out if they're the right person.  Like, in one

3    of your statements, your 302s, you say you talked to somebody

4    and they talk about these people and when you checked it was a

5    whole different person than what they were talking about.

6    They gave the wrong name.

7    A.  Okay.

8    Q.  So, I mean, you did a check on this person.  Did you do

9    that same type of check on Chuck King?

10   A.  No.

11   Q.  No?

12   A.  No.  I don't know really what you're referring to.  I

13   don't -- I mean, I balance what he had to say against all of

14   the evidence that I was collecting.

15   Q.  Right.  Well, the reason I ask this is because do you know

16   about Chuck King's mailer?

17   A.  I've never seen the mailer and I --

18   Q.  He never spoke to you about it?

19   A.  He mentioned it, but I didn't -- he came in as a lower

20   level person.  And then as I understood it the mailer did not

21   go out, so I didn't think it was -- you know, he didn't make a

22   lot of money from i2G didn't seem like and I didn't -- because

23   of that, I didn't spend a lot of energy on Chuck King,

24   honestly.

25   Q.  Okay.  I gotcha.  Now, that mailer didn't go out, okay,

 1    and that is where he and Ms. Hosseinipour had a splitting of

 2    the ways, okay?  Now, on his site, he had a Go Fund Me.  Did

 3    you see that?

 4    A.  No.

 5    Q.  Okay.  Did you see where -- or did you know that he was

 6    soliciting money for a -- to represent people in a class

 7    action lawsuit?

 8    A.  No.

 9    Q.  Okay.  The list that he sent you that is attached to your

10    statement, does it not have on there a question that "Do you

11    want to be part of a class action lawsuit that I'm funding?"

12    A.  Okay.  If it does then I -- then I was aware of it.

13    You're talking years ago.  I'm not aware of any class action

14    lawsuit that was filed.  Maybe he had that idea at one point.

15    Again, he was not the subject of my investigation.

16    Q.  Well, I understand, but he was sending you referrals, for

17    lack of a better word, of people that were saying that they --

18    they were victim investors?

19    A.  I was getting referrals -- hundreds and hundreds of people

20    were contacting me, so --

21            MR. MEYER:  Objection.  Move to strike.

22    Nonresponsive.

23            MR. WISENBERG:  Join.

24            THE COURT:  Overruled.

25    BY MR. MANNING:

 1    Q.  Now, you presented Martha Hurta in your testimony to the

 2    grand jury as a victim who lost $5,000 --

 3              MR. WISENBERG:  Objection.

 4              THE COURT:  Sustained.

 5    BY MR. MANNING:

 6    Q.  Did you ever find out that Ms. Hosseinipour was not an

 7    owner or partner or anything to that effect of i2G?

 8    A.  That she was not an owner of the corporation?

 9    Q.  Not an owner.  Not part of the corporation.

10    A.  Yeah.  I didn't find any evidence that -- well, she was an

11    independent business owner, I guess, as a participant in the

12    structure, but she wasn't an owner of the corporation -- of

13    the LLC.  Whatever it was.

14    Q.  During your investigation you said you looked at GPG

15    records -- pay records to figure out who was making the most

16    money; is that correct?

17    A.  In terms of commissions, yes.

18    Q.  Okay.  In that you receive files from GPG that you got to

19    scan.  Did you scan for multiple names of people when you're

20    figuring out how much money they made?

21    A.  It was -- those records came in the form of an Excel

22    spreadsheet, so you could sort it by name, so -- yes, I did

23    that.

24    Q.  Okay.  Did you also scan to see if, say, a person may have

25    owned a corporation and had the same email address saying I

1    can attach this person to this person?

2    A.   There was some instances where there were corporate names

3    and potential email addresses you could match.  I don't

4    remember a specific instance if I did that or not but it's

5    possible.

6    Q.   Okay.  Okay.  You interviewed Scott Majors; is that

7    correct?

8    A.   Yes.

9    Q.   In his interview did he state that he had --

10             MS. FORD:  Objection.

11             MR. SEWELL:  Objection.

12             THE COURT:  Sustained.

13   BY MR. MANNING:

14   Q.   Did you see in ProNetworking records that they spent over

15   $80,000 on product packages or Emperor package from themselves

16   and other independent business owners?

17   A.   In their bank records or --

18   Q.   In their business records which would be -- basically

19   would show up -- yeah, it would actually be in their

20   business -- banking records.

21   A.   I don't recall seeing that.

22   Q.   Were you aware that Chuck King has made videos claiming

23   that his videos are instrumental in the FBI investigation

24   against i2G and against Faraday Hosseinipour?

25   A.   I don't remember that.

1    Q.   Okay.  And you were asked earlier I believe, but were you

2    aware that Chuck King directly thanks the FBI in one of his

3    videos for having a case dismissed?

4    A.   For having what case dismissed?

5    Q.   For having -- for having -- he was being --

6             MS. FORD:   Objection.

7             MR. MANNING:  Okay.  Never mind.

8             THE COURT:  Sustained.

9    BY MR. MANNING:

10   Q.   You were shown earlier the victims survey that went out

11   from i2G -- sorry -- yeah, i2Gfraud@IC.FBI.com?

12   A.   Yes.

13   Q.   Okay.  Do you recollect that that was sent out numerous

14   times?

15   A.   I don't think it was numerous times.  We did -- I know we

16   sent it out -- we mailed it out and we emailed it out.  I

17   honestly don't remember if we did another attempt.  If we did,

18   it would have been no more than twice as far as I can

19   remember.  Now, there were other witness notification

20   communications went out after the charges were filed, but like

21   I testified before, I have nothing to do with that.

22             That's a victim witness function that exists outside

23   of the investigation.  There's laws that require victims to be

24   notified and so I don't take a part of that.

25   Q.   I understand.  I understand.  I'm just looking for

1    questions that the other lawyers have not asked.

2    A.   There shouldn't be too many left.

3             THE COURT:   The jury is to disregard that last

4    answer.   You may only answer questions, sir.

5             THE WITNESS:   I'm sorry, sir.   It's getting late.

6    BY MR. MANNING:

7    Q.   In your investigation there was -- you interviewed victim

8    investors that are on the charging document.   Did you find

9    that Ms. Hosseinipour personally sponsored any of these

10   people?

11   A.   Yes, she did.

12   Q.   She did?

13   A.   Yes.   On the indictment?

14   Q.   On the indictment.

15   A.   Yes.

16   Q.   And who did she personally sponsor?

17   A.   Well, when you say "sponsor," I interpret that to mean

18   they bought a position because of what they heard her say.

19   Q.   So when I'm on -- watching the TV and salesman says "buy

20   this car" and I buy that car, he's responsible for me to buy

21   that car?

22   A.   Yes.

23   Q.   Not the salesman that sells it to me when I go to the lot?

24   A.   Both of them would be the ones that made you sell [sic]

25   the car if you went to the lot because of the ad.

1    Q.   So if I come to you and I say, "Oh, wow.  I got this great

2    product.  I want to sell it to you."  And you watch videos

3    from different people, that person is responsible for you to

4    buy that product, not what I say to you?

5              MR. WISENBERG:  Objection, Your Honor.

6              MR. MEYER:  Relevance.

7              THE COURT:  Sustained.

8    BY MR. MANNING:

9    Q.   Now, you stated that -- in your grand jury testimony

10   you -- I just want to clarify what we got -- that

11   Ms. Hosseinipour was presenting a check with her name but it

12   was actually ProNetworking during grand jury testimony --

13             THE COURT:  That's been asked and answered, sir.

14   We're running out of time.  And I'm sorry, I'm trying to keep

15   my patience, but it's running out.

16   BY MR. MANNING:

17   Q.   You stated that the investigation was a joint

18   investigation, basically, from you and the Secret Service; is

19   that correct?

20   A.   It started that way.

21   Q.   Okay.  At any time did you try to involve the SEC?

22   A.   I received a complaint from the SEC, but -- and so I guess

23   tangentially they were involved, but -- no, I did not -- I

24   talked to them but they're our civil agency, and so I

25   didn't -- I didn't do that.

1    Q.   Okay.  Isn't it true that most multilevel market --

2              MS. FORD:  Objection.

3              MR. MANNING:  Excuse me?

4              THE COURT:  Overruled.

5    BY MR. MANNING:

6    Q.   Isn't it true that most multilevel marketing companies

7    that are investigated are investigated by the SEC to see if

8    they're legal or illegal for civil purposes?

9    A.   Most of them are investigated by the SEC.

10   Q.   Right.

11   A.   I don't understand your question.

12   Q.   Okay.  In other words, when I go and say I have a problem

13   with a multilevel marketing company and I Google "Who do I go

14   to to report this," does it come up with the FBI or the SEC?

15   A.   If it's a criminal investigation, it would be the FBI.

16   Q.   Okay.  You were an investigator for 30 years you said,

17   sir?

18   A.   Yes.

19   Q.   Okay.  In that time frame, how many multilevel marketing

20   companies did you investigate?

21   A.   This would be the -- well, I've had other fraud cases, not

22   to this -- not near to this level --

23   Q.   Okay.

24   A.   -- that it -- it could characterize, I guess, as a

25   multilevel marketing company.  Depends on your definition.

1           MR. MANNING:  Okay.  No further questions.

2           THE COURT:  Do you have some questions that can be

3     handled in a short period of time?

4           MS. FORD:  Yes.  I think I can be brief.

5           THE COURT:  All right.  Before I impose upon the

6     jury's time, do you-all have 15 minutes?  Does anybody have to

7     go?  I just would love -- for my management of this case going

8     forward, I would love to get through with this witness today,

9     so --

10          MS. FORD:  I'm being told perhaps it would be better

11    to break.  That was ill advised of me.

12          THE COURT:  Well, listen, I'm trying to nudge

13    forward.  I'm not paddling.  It's your-all's case, so -- but

14    I'm very concerned about your time.  So we'll take this up

15    tomorrow morning.  We'll start at 8:30 as promptly as we can.

16    I'll try to hit it right on the nose.

17          And so please be careful going home.  Don't talk to

18    anybody about the case, don't do any kind of research, and

19    we'll see you back here in the morning, all right?

20          COURT SECURITY OFFICER:  All rise for the jury.

21          (Jury out.)

22          THE COURT:  All right.  Agent McClelland, I did what

23    I could.  I'm not going to name names or point fingers, but

24    Madison Sewell, it's all his fault, so -- we'll start back

25    at 8:30.  You can hand those to the court reporter.  I'm not

1    sure how many of them -- how many of those were actually

2    admitted.

3           All right.  You may be seated.  Do you want to give

4    them their present?  I'm going to give you-all some jury

5    instructions that are in the drafting phase.  I don't -- I

6    would be shocked if this was the final version.

7           MS. FORD:  We thought it was a doughnut, Judge.

8           THE COURT:  Wait till tomorrow.  We'll see what

9    tomorrow brings.  So at some point tomorrow I anticipate we'll

10   have a conversation about those, so -- and as I -- as I

11   promised, I definitely wanted to have that securities

12   instruction before Dr. -- Professor Warren testifies, so I

13   want to make sure we get that ironed out, but we'll have to

14   iron out the rest of these -- I don't have -- I guess I don't

15   have defense instructions yet 'cause it's still -- you-all

16   don't have -- you haven't submitted instructions with the

17   defense theory or whatever, but -- so -- I know they're going

18   to have to be supplemented.  I anticipate they will, but at

19   least this is the way we've got them crafted, so you'll have

20   opportunities to digest them and hopefully all I will hear is

21   "Good job."  Good job, Mr. Laufenberg.

22          MR. SEWELL:  The United States will likely have some

23   suggested -- given what's happened so far in trial, the United

24   States will likely have some suggested supplements.  I haven't

25   read through them, of course, but we'll file something as

1   well.

2          THE COURT:  All right.  I'm hoping for just attaboy.

3   No.  Listen, this is not the final version, but this is where

4   we are today.  I think the sooner we get those to you the

5   better, and so this is -- this is where we are, so --

6          MR. SEWELL:  Submit those by Monday would be fine?

7          THE COURT:  I'm sorry?

8          MR. SEWELL:  Do you want our supplementary --

9          MS. FORD:  It will depend on when they call their

10  expert.

11         MR. MEYER:  He's not going to testify on Monday.

12  He'll probably testify Tuesday, hopefully.

13         MR. SEWELL:  Okay.

14         THE COURT:  That was me knocking on wood, but --

15  anyway, so there's time to talk about them, but certainly

16  we -- I wanted to get those to you.  Sometimes the

17  instructions take a long time to argue, sometimes they don't,

18  but we've already talked about some of these issues, so

19  hopefully with regard to the securities anyway -- security --

20  definition of security, definition of a pyramid scheme,

21  etcetera, we'll at least show you where we've got -- you know,

22  we've got it right now.  Mr. Wisenberg, yes, sir?  I could

23  tell you had something you wanted to talk about.

24         MR. WISENBERG:  I do just want to raise some

25  scheduling type questions keeping in mind that I understand

1    that our witnesses are under subpoena, so they're under court

2    order, but they seem to generally jump higher when the

3    government is cracking the subpoena whip.

4            But -- but the two that we wanted to get on for sure

5    tomorrow who are our first two projected witnesses who have

6    been very cooperative.  So one of them was on a 7:00 a.m.

7    flight which he changed to about 7:30 p.m. from -- is it

8    Evansville -- Evansville.  So I think -- gosh, I hope we'll be

9    able to get him on if the redirect isn't going to be too long.

10           MS. FORD:  What time did you say the flight is from

11   Evansville?

12           MR. WISENBERG:  7:30 at night.

13           MS. FORD:  At night?  Okay.

14           MR. WISENBERG:  But we have another witness who is

15   going to be our first who would have to be at the Louisville

16   airport at 10:30 a.m. and that isn't going to happen, right, I

17   don't think.

18           MR. SEWELL:  There's a time change going to

19   Louisville, so that's -- I doubt that -- a 10:30 flight at

20   Louisville is going to be very ambitious.

21           MR. WISENBERG:  He needs to be at the Louisville

22   airport -- oh, I'm sorry.  It's he needs to leave here by

23   10:30.  He needs to be at the Louisville airport by 12:30.

24   Actually, when he sent me this, it was 10:00 a.m. today.  He

25   wanted to be released early if he knew he wasn't going to be

1    on tomorrow, but it doesn't sound like he -- obviously he's

2    not going to be on tomorrow.

3            MR. SEWELL:  Who is that?

4            MR. WISENBERG:  That's Mr. Bennett -- Scott Bennett.

5    And Javellana is the one who got his flight changed to 7:30,

6    so I just don't think there's -- I don't think he can get a

7    later flight tomorrow.  He's tried.

8            MR. MEYER:  Your Honor, I don't know if this is -- I

9    certainly don't want to engage in ineffective assistance of

10   counsel, but I mean, I'm going to make, you know, a Rule 29

11   motion and I was going to actually -- I wrote something and I

12   was going to file it after they complete their proof, but my,

13   I guess, suggestion would be that we effectively take the

14   witnesses out of order so we -- you know, I want to argue it.

15   I don't want to break --

16           THE COURT:  Let the record reflect Mr. Meyer's

17   making air quotes.

18           MR. MEYER:  And Solomon may have more experience

19   than me, but I would think we wouldn't waive our ability to

20   make that motion if we take our witnesses immediately out of

21   order and then make the motion maybe at the end of the day or

22   first -- you know, maybe Monday morning or something just so

23   we can get these people on.

24           THE COURT:  That's fine.  And I think if we order

25   that that's what we're doing, I think -- I think that -- I

1    mean, you can say air quote "we're taking the witnesses out of

2    order," but if I say that's what we're doing, then you're --

3    and that you're preserving your Rule 29 motions, I can't

4    imagine that would be ineffective.

5           I'll still consider them as though they were made at

6    the end of the government's proof.  I'm trying to be flexible.

7    I would have -- I tried to -- I was thinking maybe we might

8    get your person that was here, if it would have taken a half

9    hour, we could have bent some time in for that.  It just

10   didn't work, but -- so we'll try to work with people's

11   schedules as best we can.

12          My impression is that the redirect -- my -- I mean,

13   I'm afraid I've gotten to the point where -- I don't want to

14   act like I know everything.  I just would have thought that

15   the redirect could be done within 20 to 30 minutes.

16          MS. FORD:  Yes.  I'm not planning an extensive --

17   until Mr. Sewell cracked the whip on me, but I'm not planning

18   a lengthy redirect.

19          THE COURT:  So then there might -- so anyway, I'm

20   hoping --

21          MR. WISENBERG:  We're starting at 8:30?

22          THE COURT:  8:30.  I'm hoping that we'll get

23   finished with this witness very quickly tomorrow.  And then if

24   you want to put your witnesses on, I mean, maybe it could be

25   as early as 9:15.  I'm assuming if there's a half an hour and,

1    you know, for every action there's a reaction until it just

2    peters out, but I'm hopeful if it's -- the briefer the

3    redirect is -- this is my hopes because I'm still trying to

4    get this case finished.

5            But so what my hopes -- I hope I make this clear

6    every time I say it.  What my hopes are don't really matter

7    other than I'm trying to get this jury through their job and

8    let them get back to their lives.  And in the meantime, I want

9    to make sure, of course, that the defendants here get every --

10   every minute that they need, but also not a minute more of an

11   imposition on the jury than we have to, so that's why I'm

12   trying to move things along and I'm hopeful still that we

13   might be able to get finished next week.  It would be helpful

14   if we got a lot done tomorrow.

15           And then maybe Monday if that's when the -- if

16   that's when we circle back to the Rule 29 motions, maybe have

17   the jury come in at 9:00 on Monday.  I'll have you-all come in

18   at 6:00 o'clock.  You tell me how much time you need to argue

19   the motions, but --

20           MR. MEYER:  I would think if we started at 8:00 we

21   would be fine.

22           THE COURT:  That would give us an hour and --

23   hopefully.  I would imagine that would be plenty, but --

24           MR. WISENBERG:  I imagine the Rule 29 arguments are

25   going to be a lot quicker than the jury instruction -- the

1    jury charge conference.

2            THE COURT:  You're wise beyond your years,

3    Mr. Wisenberg.  I frankly don't anticipate -- especially

4    something in writing, but I don't anticipate those arguments

5    are going to take a lot of time.  I mean, you make the

6    motion --

7            MR. MEYER:  They're pretty -- my issues are pretty

8    discreet issues.

9            THE COURT:  Yes, I think so.  I think I see where

10   that's going and -- so anyway -- well, and I'm sorry if I got

11   a little testy.  I'm just -- honesty I'm just trying to get

12   things moving forward, so -- so anyway, doing the best we can.

13   So I will see you-all at 8:15 in the morning.  We'll try to

14   get started promptly at 8:30 and get as much done as we can

15   tomorrow, all right?  You-all have a nice evening.

16   (Proceedings concluded at 5:13 p.m.)

17

18                C E R T I F I C A T E

19       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

20   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21

22
         _____s/April R. Dowell_____        2/10/2023_____
23       Official Court Reporter, RMR, CRR       Date

24

25

```
 1                              INDEX

 2     WITNESSES: Dave McClelland

 3          Continued Direct Examination by Ms. Ford        8
            Cross-Examination by Mr. Wisenberg
 4          (Filed separately)
            Cross-Examination by Mr. Meyer                 28
 5          Cross-Examination by Mr. Manning               89

 6
                               EXHIBITS
 7
       GOVERNMENT:
 8     Exhibits 57 through 62                              10
       Exhibits 63A and B                                 15
 9     Exhibit 232                                         21
       Exhibit 596                                         17
10

11     DEFENDANT:
       Barnes Exhibits 46, 47, and 48                     32
12     Barnes Exhibit 49                                   74
       Barnes Exhibit 50                                   74
13     Barnes Exhibit 51                                   77
       Barnes Exhibit 52                                   79
14     Barnes Exhibit 53                                   83
       Barnes 657A and 657B                                59
15

16

17

18

19

20

21

22

23

24

25
```